No. 66,268

STATE OF KANSAS, *Appellee,* v. RICHARD GRISSOM, JR., *Appellant.*

(840 P.2d 1142)

Opinion filed November 10, 1992.

*Steven R. Zinn*, deputy appellate defender, argued the cause; and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Paul J. Morrison*, district attorney, argued the cause, and *Debra A. Vermillion*, *Steven J. Obermeier*, *N. Trey Pettlon*, assistant district attorneys,

and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Richard Grissom, Jr., from his convictions of three counts of first-degree murder, one count of aggravated kidnapping, four counts of robbery, two counts of aggravated burglary, and one count of misdemeanor theft.

Grissom raises 17 issues, several of which have subissues. This case rests upon circumstantial evidence. The facts are set forth in greater detail than usual and in chronological order. They will be supplemented as we discuss the issues.

Joan Butler, Christine Rusch, and Theresa Brown disappeared in June 1989. All three women were in their early 20s and resided in Johnson County, Kansas. The women have not been seen or heard from since their disappearances, nor have any of their remains been located. All of the convictions except for the theft conviction involve the above-named three women.

At the time of the disappearances, the defendant, Richard Grissom, Jr., owned Apex, a business that cleaned and painted apartments in the Kansas City area, Olathe, and Lawrence. Grissom kept his painting supplies in a locker rented from South Metcalf Mini Storage in Stanley, Kansas, under the name of Randy Rodriguez. At trial, a handwriting expert, after comparing the hand printed name and address on the Rodriguez rental agreement with Grissom's known printing, concluded it was "highly probable" Grissom had printed the name and address on the Rodriguez rental agreement.

Grissom hired men from missions and homeless shelters to work for Apex. Additionally, in May 1989, Grissom hired Marcelais Thibodo. Grissom and Thibodo had met several years before and periodically would see each other around town. Grissom drove a used 1981 brown Toyota Corolla, which Thibodo helped Grissom purchase because Grissom said he had a poor credit rating. The car was registered in Thibodo's name.

In the spring of 1989, Grissom began dating Cathy Arenal, a student at the University of Kansas. On Saturday evening, June 17, 1989, Arenal met Grissom at a nightclub in Lawrence, Kansas.

When Grissom walked Arenal to her car between 2:00 and 2:30 a.m., he indicated he was going to drive back to Kansas City that night.

In June 1989, Joan Butler lived alone at Comanche Place Apartments in Overland Park, Kansas. The previous fall she had moved from Wichita to Overland Park. Butler was close to and maintained frequent contact with her family, who resided in Wichita.

On June 11, 1989, Butler called her father to inform him that her Honda had been totaled in a multi-vehicle accident. The following day, Butler rented a 1989 maroon Chevrolet Corsica.

On Friday evening, June 16, 1989, Butler called her mother. They visited about Butler's pending move to an apartment on the Country Club Plaza, about having her family spend Thanksgiving in Kansas City, and about buying a car. Butler told her mother she would call her father on Sunday, which was Father's Day.

On Saturday evening, June 17, after getting off work from her part-time job on the Plaza, Butler went to the apartment of a friend, Celeste Becker. Becker's boyfriend met them at Becker's apartment, and the three went dancing until 2:30 a.m. They then returned to Becker's apartment, where they ate and talked. Butler mentioned that it was the first Father's Day she would not be spending with her family and that she was going to call her father on Sunday to wish him a happy Father's Day. After an hour or so, Butler said she was going to go back to her apartment because she was tired and needed sleep. Before Butler left, she and Becker made plans to go out the following weekend. Butler left Becker's apartment at approximately 4 a.m.

Butler evidently arrived at her apartment because the clothing she had been wearing was found later in her bedroom.

Within two hours after Butler left Becker's apartment, money was withdrawn from Butler's checking account. Butler's checking account at Capitol Federal Savings allowed her automatic teller machine (ATM) privileges. Capitol Federal Savings has eight branch offices in Johnson County, and each branch has an ATM. The maximum ATM cash withdrawal allowed per day is $300. At 5:59 a.m. on June 18, 1989, a $300 cash withdrawal was made from Butler's account. At 3:45 a.m. on June 19, 1989, a second $300 cash withdrawal was made from Butler's account at a dif-

ferent branch location. A balance inquiry followed both cash with-drawals. At 2:14 a.m. on June 20, 1989, a balance inquiry was made at yet another branch location. A third $300 cash withdrawal was made, leaving no money in Butler's account.

Butler did not call her father on Father's Day, Sunday, June 18. Butler worked for Montague-Sherry Advertising Agency in downtown Kansas City, Missouri. She neither showed up for work nor called her office on Monday morning, June 19. Butler's co-workers considered this atypical behavior because Butler had es-tablished a pattern of being the first to arrive at work. Butler was considered responsible and ambitious by family, friends, and co-workers. Her supervisor, Gary Coleman, became so concerned when no one was able to reach Butler by telephone that by mid-morning he drove to her apartment. Coleman testified that there was no response to his knock on Butler's apartment door and that he did not see Butler's rented car in the parking lot. After Coleman's unsuccessful effort to locate Butler, the agency con-tacted her father to see if he had knowledge about his daughter's whereabouts.

Butler's father then called the manager of Comanche Place Apartments and asked her to check his daughter's apartment. Between 11:00 and 11:30 a.m., the manager entered Butler's locked apartment and confirmed that Butler was not in the apartment.

Two of Butler's neighbors, Deb Stryker and Sarah Blanz, also entered Butler's apartment on Monday, June 19. Stryker lived in an apartment adjacent to Butler's and was a good friend of Butler. Butler's father had contacted Stryker to ask for her as-sistance in locating Butler. Between 10:00 and 10:30 p.m., a friend of Blanz' entered Butler's apartment through an open win-dow and unlocked the front door to let Stryker and Blanz into the apartment. After finding that Butler was not in the apartment, the trio looked around. They did not notice anything out of the ordinary.

Blanz' apartment was directly below Butler's. Blanz testified that between 4:00 and 5:00 a.m. on Sunday, June 18, she was awakened out of a sound sleep by a loud "thump" noise coming from above her. The noise scared her. She got up and looked out the window into the parking lot, but did not see anything.

Blanz said she saw Butler's rented Corsica in the apartment complex parking lot on Sunday morning, but was not sure if the car was there Sunday evening and did not remember seeing it Monday morning or thereafter.

Joann Vermillion lived in a townhouse across the street from Comanche Place Apartments. On Tuesday, June 20, Vermillion noticed a brown Toyota parked in one of her assigned parking places. The car, which did not have a license tag, remained there until the following Friday. At trial, Vermillion identified Grissom's brown Toyota as the car she had seen parked in her parking place.

Thibodo, who was employed by Grissom, testified that when he saw Grissom on Tuesday, June 20, Grissom was driving a red Corsica. Grissom told Thibodo that he had rented the Corsica for a job in Lawrence. When Grissom asked Thibodo to pick up lunch for the other employees, Thibodo asked to drive the Corsica. Thibodo said Grissom was reluctant, stating that because it was a rental car he should not let anyone else drive it. Grissom eventually agreed, but told Thibodo not to look through the trunk or the glove compartment. Thibodo did not open either. Later that evening, Thibodo gave Grissom a ride to an apartment complex in Overland Park where the brown Toyota was parked. Grissom still was driving the Corsica when Thibodo saw him later that week.

Arenal, who had been dating Grissom, testified that she saw Grissom driving a maroon Corsica on Monday afternoon, June 19, and that when asked, he told her he had rented the car. Arenal stated that he also told her he was very exhausted because he had not slept since she last saw him early Sunday morning. When Arenal saw Grissom the following weekend, he again was driving the Corsica. She also stated that during the weekend Grissom gave her a peso pendant as a present.

Carla Dippel also resided at Comanche Place Apartments. She was not acquainted with Butler or Grissom. Dippel's apartment was burglarized the same weekend that Butler disappeared. Dippel had been out of town during that weekend. When she returned, she noticed a peso pendant and a gold rope necklace were missing. These items formed the basis for the theft conviction.

The pendant had been custom made by Reeds & Sons Jewelers in Sedalia, Missouri. Dippel had purchased the necklace in Florence, Italy. At trial, Dippel identified the peso pendant that Grissom had given to Arenal as the one stolen from her apartment. The manager of Reeds & Sons Jewelers corroborated that the peso pendant given to Arenal was the pendant the jewelry store had made for Dippel.

On Sunday evening, June 25, the Lawrence police were notified that a Corsica, matching the description of the car rented by Butler, was parked in the parking lot of Trailridge Apartments in Lawrence. Officer Brian Edwards was dispatched to the scene at 9 p.m. After locating the vehicle, he watched it from a distance. A few minutes later, a man, later identified as Grissom, walked over to the Corsica and opened the trunk. Edwards approached Grissom, asking first for identification and then who owned the car. According to Edwards, Grissom said that his identification was inside Apartment 531 and that people inside the apartment had given him the car keys. Upon request, Grissom gave Edwards the car keys. Edwards followed Grissom into the apartment building. Grissom then sprinted toward Apartment 531. He managed to get inside the apartment, close the door, and escape through a window before Edwards could catch up with him.

Thibodo testified that on Sunday, June 25, around 9 p.m., he received a telephone call from Grissom. Grissom asked him for a ride to Kansas City with "no questions asked." Thibodo picked up Grissom at a Dillon grocery store, located one-half mile or less from Trailridge Apartments. As they drove by Trailridge Apartments on their way out of town, Grissom asked Thibodo to slow down because he wanted to see if the police still were there. By way of explanation, Grissom said Arenal must have called the police on him. Grissom added that he had been stealing from another person's bank account. At that point, Thibodo said he did not want to hear any more.

Thibodo drove Grissom to Grissom's apartment in Lenexa, Kansas. Upon reaching the apartment, Grissom hurriedly started packing and loading the packed items into the back of Thibodo's pickup. Thibodo testified that while they were packing and loading, Grissom told him he could have the painting business and anything left in the apartment.

At trial, Thibodo said that when Grissom was finished at the apartment, Grissom told him to meet him either at Trafalgar Square Apartments or the nearby Motel 6. They met in the Motel 6 parking lot and transferred the items from Thibodo's pickup to Grissom's Toyota. Grissom told Thibodo he was headed for California.

The police impounded the Corsica, and the vehicle was searched the next day, June 26, by officers employed by the Johnson County Criminalistics Laboratory (Crime Lab). A wallet found inside the car contained various bank cards and forms of identification, including a Kansas ID photo card with the name "Yoon C. Cho" and Grissom's photograph, a Kansas driver's license with the name "Yoon Cho" and Grissom's photograph, a Kansas driver's license with Grissom's name and photograph, and bank cards with the names "Rikki Y. Cho," "Rikki Y. C. Cho," and "Yoon Cho." Testimony was presented that Grissom had used those aliases, plus the alias Randy Rodriguez. Grissom's biological parents are a Korean mother and a black father. The police found a Crosman air pellet pistol in the glove compartment of the Corsica. A latent fingerprint was recovered from the left front seat belt buckle and subsequently was identified as Grissom's. Additionally, hair consistent with Grissom's hair was located inside the car.

The trunk contained painting supplies and equipment. Several minute specks of dried blood were found on the carpet in the trunk.

Because a sample of Butler's blood was not available for comparison purposes, "reverse style paternity testing" was conducted on the blood sample from the trunk and blood samples from Butler's parents to determine whether the sample of blood found in the trunk could have come from a child of Butler's parents. Cellmark Diagnostics, a Maryland company that performs DNA analysis, conducted the testing. At trial, two technicians and the manager of research and development at Cellmark Diagnostics testified. The research and development manager testified it is "highly likely, [or] in other words, all of genetic evidence is totally consistent" with the donor of the blood sample taken from the trunk being a child of Butler's parents. One of the technicians stated that in his opinion, "there is no other explanation than

that being the blood of a biological child of those two people." Butler's siblings testified they had not had any contact with the Corsica.

In searching Butler's apartment, the officers found no signs of a struggle or forced entry. No blood, semen, or Negroid hair was found in Butler's apartment. In Butler's bedroom, the officers found the clothing she was wearing when she was last seen.

The officers also noticed a gold necklace lying on the carpet in the hallway near the kitchen. Although the officers photographed the necklace, they did not seize it.

After the apartment had been released to Butler's family, relatives went to the apartment to pack up her belongings. One of the relatives, Kelly Heintzelman, testified that she found a gold rope necklace lying on the carpet in the hallway. Heintzelman put the necklace with Butler's other jewelry, which subsequently was taken to Wichita. Eventually, the necklace was turned over to the Overland Park Police Department. At trial, Dippel identified the gold rope necklace found in Butler's apartment as the necklace that she had bought in Italy which had been stolen from her apartment. A jewelry manufacturer's representative examined the necklace and confirmed it had been manufactured in Italy.

There is evidence that Grissom was acquainted with Christine Rusch and Theresa Brown. Rusch and Brown shared an apartment at Trafalgar Square Apartments in Lenexa. Grissom's company had painted at Trafalgar Square Apartments. Rusch told family and friends that a painter or maintenance man had brought her newspapers and once had offered her an abandoned charcoal grill. Thibodo testified that shortly after going to work for Grissom, in mid-May 1989, he attended a pool party, which was hosted by the management of the complex, with Grissom. Thibodo said Grissom introduced him to Rusch and Brown as "Christine and Theresa" at the party. According to Thibodo, the four of them visited for about five minutes, and then he and Grissom left.

Thibodo also testified to the following: Approximately two weeks after the pool party, he accompanied Grissom to one of the apartments at Trafalgar Square to check for water damage. Grissom let them into the apartment with a pass key. While they were there, Grissom rummaged through closets, dressers, and even a jewelry box. At one point, Grissom held up a pair of

panties for Thibodo's inspection. Grissom told Thibodo the apartment belonged to the women they had met at the pool party. The apartment manager testified she had checked the records and a work order had not been issued to see if a ceiling in Rusch and Brown's apartment needed repainting because of water damage.

Rusch was employed by Firestone Optics, a contact lens manufacturing company owned by her father. Rusch's father described his daughter as a reliable employee. Rusch had a close relationship with her parents. She saw her father every work day and usually spent part of each weekend with her parents.

Brown worked at the Hickman Mills Dental Clinic. Brown was particularly close to her sister, Joyce Greenstreet, who lived near the clinic. Brown had lunch with Greenstreet almost every day. Greenstreet described Brown as responsible, both as an individual and as an employee. Brown also had a good relationship with her parents, who lived in Raymore, Missouri. She would see them approximately once a week and on holidays. In June 1989 Brown was making plans to return to college and intended to move in with her aunt, who lived in Leawood.

Rusch spent most of Sunday, June 25, with James Grooms, a good friend. In the evening, Rusch and Grooms went to a local club, where they visited with friends and listened to a band. Rusch shared pictures of the party hosted the previous night and was described as being in a good mood. Rusch mentioned to Grooms that she planned to prepare a dinner Monday evening for her mother, who recently had been released from the hospital. Rusch left the club between midnight and 12:30 a.m., walking out with a friend, Beth Cupp. Cupp testified that Rusch said she was leaving because she had to get up to go to work the next morning. Cupp watched Rusch drive away alone in her 1985 Dodge Colt.

On Sunday morning, June 25, Brown called Greenstreet, who testified that her sister talked about the party and her boyfriend and, generally speaking, was in a very good mood. Brown spent most of Sunday with Mike Raunig, a Johnson County Sheriff's Department deputy, with whom she had a serious, romantic relationship. She stayed the night and left about 6 a.m. to return to her apartment and get ready for work. Raunig testified that

Brown left wearing a blue University of Kansas T-shirt with a white T-shirt underneath it and surgical scrub pants. Raunig never heard from nor saw Brown again. Brown evidently reached her apartment because the T-shirts she had been wearing when she left Raunig's house were found on her bedroom floor.

Rusch had a money market account with check-writing privileges at the Metcalf State Bank in Overland Park. On Monday morning, June 26, before 9 a.m., four checks were cashed on Rusch's money market account, depleting most of the money in the account. A handwriting expert with the Johnson County Sheriff's Department compared the checks with Rusch's known handwriting. The expert testified that all four checks bore Rusch's signature, but noted that the quality of the handwriting deteriorated and lost its "naturalness" between the writing of the first and fourth checks.

At 7:58 a.m., a check for $500 was cashed at the branch of the bank located at College Boulevard and Quivira Road. The transaction occurred at the drive-up window. The teller who cashed the check testified that the signature on the check matched the bank's records and that nothing was unusual about the transaction. The teller did not remember the vehicle or whether there were any passengers in the vehicle. A customer who was making a deposit at the same branch at 7:57 a.m. on June 26 testified that he saw a car in the far right drive-up lane in which the driver was a white woman and the passenger was a black man. The customer could not remember any other specifics. Rusch was a white woman and Grissom is a dark-skinned man.

The second transaction, which also involved the cashing of a $500 check, occurred at 8:24 a.m. at the 103rd and Metcalf branch bank. The teller who cashed the check testified that she checked Rusch's driver's license before approving the check. The teller did not remember anything else about the transaction. The teller was in audio communication with Rusch, who did not indicate anything was wrong.

At 8:36 a.m., a third $500 check was cashed, this time at the branch bank located at 79th and Metcalf. The teller did not remember anything about the transaction.

The final transaction involving Rusch's money market account occurred with the cashing of a $900 check at 8:43 a.m. at the

75th and Metcalf branch of the bank. The teller remembered the transaction, testifying that she checked the driver's license of the woman cashing the check. The teller identified a picture of Rusch as the woman who had cashed the check and said Rusch was wearing sunglasses. The teller was unable to see whether there was a passenger in the car with Rusch because of the placement of a pole. Rusch and the teller were in audio communication, but Rusch did not indicate anything was wrong.

Brown had a checking account, with ATM privileges, at Boatmen's First National Bank. Brown could use her ATM card at other banks, providing the banks belonged to the same computer network. At 9:25 p.m., on June 26, at an ATM located at the American Bank in Raytown, Missouri, a savings account inquiry was received. Brown had a checking account, not a savings account, with Boatmen's. A camera within the ATM photographed the person conducting the inquiry. The photograph was of a grim and disheveled Rusch. At 9:57 p.m. on that same day, at an ATM located at the Belton, Missouri, branch of Boatmen's, a balance inquiry concerning Brown's checking account occurred. The inquiry was followed by a $300 withdrawal. Again, the transaction was photographed and the photograph was of Rusch.

In June 1989, Jacqueline Faught was the manager of Mini Warehouse in Raytown, Missouri. Faught testified that on the morning of June 26, she rented a 10 by 30 foot drive-through storage unit to a young white woman, who signed the agreement as Christine Rusch. The storage unit was large enough for a car to be driven into it. A vehicle also could be driven through the unit, and there were garage doors on opposite sides of the unit. The Crime Lab handwriting expert later determined that the signature was a forgery. At trial, Faught identified a picture of Brown as looking very much like the woman to whom she had rented the locker.

According to Faught, the young woman was accompanied by a dark-skinned, dark-haired man of mixed race. At trial, Faught said the man she saw on June 26, 1989, looked like Grissom. Faught said the woman "seemed a little distressed." Although the woman filled out the rental application, she looked to the man for help in supplying the required information, such as the

woman's address and her place of employment. The address given was P. O. Box 300761, Kansas City, Missouri, 64130.

Faught testified and produced documents that in February 1989, her husband rented a storage unit to an individual by the name of Rikki Yoon Cho. This individual signed the agreement as Rikki Y. C. Cho and gave as his address, P. O. Box 300761, Kansas City, Missouri, 64130, the same address given for the June 26 rental agreement. An individual giving the name of Rikki Y. C. Cho rented a post office box with that number in February 1989. The State's handwriting expert testified that in his opinion, the handwriting contained in the post office box application belonged to Grissom.

Faught saw Cho when he came in for his refund in March 1989. Prior to trial and at trial, Faught said that the man who identified himself as Rikki Yoon Cho looked like Grissom.

The storage unit rented under Rusch's name was not processed for latent fingerprints, hair, fibers, blood, etc., until October 12, 1990. Several areas of the unit tested positive for blood when a benzidine presumptive test was conducted. Some trace evidence also was found. One or two individuals, however, had occupied the storage unit after the June 26, 1989, rental had terminated.

On Monday morning, June 26, at approximately 8:45 a.m., 15 minutes after work started, Rusch called her office and said she was ill and planned to go to a doctor. Rusch also said, "Tell my dad that I will be here later." The employee who talked to Rusch testified there was "a little bit of hurry in [Rusch's] voice," but otherwise she sounded normal.

Brown did not show up for work or call her office on Monday morning, June 26. Brown's parents were out of town; however, one of her brothers, who was living with their parents, was at home that morning when a clinic employee called, asking if Brown was there. Brown's brother was told that his sister's roommate had called, stating that Brown was ill and would not be in to work. He called Brown at her apartment many times during the day and even stopped by her apartment after work, but was unable to make contact with her.

Brown did not call her sister or show up at her sister's house for lunch on Monday, which was unusual behavior because Brown always called if she could not make it for lunch. Greenstreet was

concerned, especially when no one answered the telephone at Brown and Rusch's apartment and when she learned Rusch was not at work.

Meanwhile, Rusch's family also was becoming concerned. Rusch's father stopped by his daughter's apartment at approximately 9 p.m. that night. He noticed her car was not in the apartment complex parking lot. He then went to the apartment, calling out his daughter's name and pounding on the apartment door. There was no response. He tried the door, but it was locked. Thinking she might have become seriously ill, he drove to the nearest hospital. Rusch's father's efforts to locate his daughter were not successful.

Rusch's father returned to his daughter's apartment early the next morning, June 27, around 7 a.m. Again, Rusch's car was not in the parking lot and there was no response to his knocking on the door or to his yelling. He noticed with some surprise the deadbolt was not locked. Rusch previously had told him that she and Brown always used the deadbolt, and he personally had heard Rusch lock the deadbolt after he left her apartment one morning. He decided to let himself in using a laminated card to slip the other lock. He walked through the apartment, being careful not to touch anything. He found no one in the apartment, but noticed a curling iron in one of the bathrooms was plugged in and turned on. He left the apartment and drove to his office. He decided to see if Rusch showed up for work before calling the police.

On Tuesday morning, Lenexa police officers entered Rusch and Brown's apartment. The officers found no signs of a struggle, forced entry, or burglary. There also was no indication anyone had moved out of the apartment. For example, the kitchen and bathrooms were fully stocked. After walking through the apartment, the officers determined that everything looked "normal." Raunig testified that the police asked him to go to Brown's apartment on Tuesday mid-morning, June 27, at which time he identified a blue T-shirt found on her bedroom floor as the one she had been wearing when she left his place.

Also on that Tuesday morning, June 27, Scott Hendricks was riding his bicycle to work in southern Johnson County. At the corner of 139th and Metcalf, Hendricks noticed credit cards, including a Dillard's card with Rusch's name on it; a woman's V-

neck white T-shirt with a yellowish stain in the middle; personal papers, including concert ticket stubs and various Metcalf State Bank papers; and a glasses case lying in the ditch. On his way home from work that afternoon, Hendricks noticed the items still were lying in the ditch, so he stopped and picked up everything except for the glasses case and T-shirt. Hendricks planned to return the items to the owner; however, once he recognized Rusch's name as one of the women who had disappeared, the police were notified. Hendricks showed the police where he had left the glasses case and T-shirt, but the items were no longer in the ditch. Rusch's father testified that his daughter wore either glasses or contact lenses. A friend of Rusch's, Ellen Dixon, testified that she had left a white T-shirt with a Coke stain on it in Rusch's car. The ditch in which the items were found was estimated to be approximately three to four miles from the South Metcalf Mini Storage, where Grissom kept his painting supplies.

On Tuesday afternoon, Rusch's driver's license was found by a truck driver in Kansas City, Missouri, on the 87th Street on-ramp to I-435 South.

On Tuesday evening, Billy Mayo, a resident and part-time maintenance worker at Stonybrook South Apartments in Grandview, Missouri, noticed a man standing underneath a stairwell. At trial Mayo identified that man as Grissom. Mayo asked the man what he was doing. The man replied that he was looking for the apartment of a woman named Michelle. Mayo gave an inaccurate description of a Michelle who resided at the apartment complex, to which the man responded, "Yeah, yeah, that is her." Mayo suspected the man was a prowler. Mayo returned to his apartment and contacted the police. A Grandview police officer arrived at 9:35 p.m., but did not find anyone.

At approximately 10 p.m. Tuesday, Mayo contacted the apartment complex manager, Stephanie Foster. After Mayo described the man he had seen, Foster thought it sounded like Grissom. Foster was acquainted with Grissom because he previously had done contract painting and cleaning at Stonybrook South. Earlier that evening, a friend had informed Foster that Grissom had been linked to Joan Butler's disappearance and that Grissom drove a brown Toyota. Foster remembered that at one time Grissom had access to her apartment and office. She contacted the police and

asked them to return. The police arrived at approximately 10:35 p.m., but again found no one.

About 11 p.m. Tuesday, Mayo found a brown Toyota in the apartment complex parking lot. Mayo noticed the car because earlier he had been told that a similar car reportedly had been driven by a man who had assaulted a woman at Apple Creek Apartments in Kansas City, Missouri. Mayo also worked part-time at Apple Creek.

Using a flashlight, Mayo looked into the Toyota. He noticed the car was full of personal items. He saw a ring of keys on the dashboard and thought one of the keys resembled his master key to Apple Creek Apartments. On the floorboard, he could see about three-fourths of a credit card and could discern the name Theresa Brown on it.

Mayo informed Foster of the car, and she went to look into it. Foster also used a flashlight. She noted the car was packed full of personal items, with room for only the driver. She saw two credit cards on the floorboard and could make out the name Rusch on one of them. She also noticed the key ring and recognized the Apple Creek master key. Foster called the police.

Grandview police officers arrived about 11:20 p.m. The police had a difficult time establishing ownership of the vehicle—the Toyota had a stolen Nebraska license plate. The officer testified that he saw credit cards on the floorboard, but could not read the names on the cards. In order to help determine who owned the vehicle, the officer had the tow truck driver open the car door. The brown Toyota was towed to the Grandview police station, and a warrant to search the car was obtained.

At the hearing on Grissom's motion to suppress evidence obtained from the search of the vehicle, Foster testified that pursuant to her authority as manager of Stonybrook South, she directed the Grandview police to tow the brown Toyota. She explained that Stonybrook South was private property and that it was the apartment complex's policy for unattended or illegally parked vehicles to be towed. A Grandview police officer testified that it was their department's policy to tow a parked vehicle displaying a stolen or improper license plate. Grissom's pretrial motion to suppress evidence was denied.

Also on Tuesday evening, a Pontiac Grand Am, which was parked in the parking lot of an apartment complex located across Highway 71 from Stonybrook South Apartments, was stolen. The Grand Am subsequently was located at the Dallas-Fort Worth International Airport on July 7, 1989, when Grissom was apprehended there.

On Wednesday morning, June 28, Johnson County Sheriff's Department deputies, with the assistance of a Grandview police detective, searched the brown Toyota. The officers took approximately 1,400 individual items from the vehicle. Two credit cards were removed from the floorboard on the driver's side. One card was in Rusch's name and the other was in Brown's name. Three rings, identified as belonging to Rusch, were found in the glove compartment.

Various keys were found in the car. Two keys were found on the front left floorboard. One key fit the front door lock to Rusch and Brown's apartment, and the other key fit the front door lock to Rusch's parents' house. Rusch's mother testified that Rusch had been given a key to her parents' house. A third key was found on a rear floorboard, and that key was found to fit the front lock of Butler's apartment. The key ring recovered from the dash contained 14 keys. Two keys on the ring were identified as master keys to Rusch and Brown's apartment. At trial, the manager of Trafalgar Square Apartments, where Rusch and Brown had lived, testified that Grissom had been given a set of master keys when he painted at the complex in 1989. Another key on the ring was identified as a master key to Apple Creek Apartments.

A photograph album containing pictures of Grissom was found inside the Toyota. Also found were two briefcases containing five forged birth certificates, including certificates for Randy Rodriguez and Rikki Yoon Cho Cho, with matching GED certificates; approximately 300 blank birth certificates; and official government seals and a rubber stamp. A pair of black gloves, a 12-inch silver knife, and three other knives also were recovered from the vehicle.

None of Grissom's fingerprints were found in the interior of the Toyota or on items processed for fingerprints, such as the credit cards, the keys found on the front floorboard, and a tag

attached to a key. Random testing for blood inside the car was negative.

On Wednesday afternoon, June 28, Rusch's Dodge Colt was discovered in the parking lot of the Motel 6 located next to Trafalgar Square Apartments. On the driver's side, there was a dent with a "significant smearing of blue paint." It subsequently was determined that the blue paint came from a post at the Mini Warehouse in Raytown. Several small fragments of hair were found inside Rusch's vehicle. Although the hair was too short and fragmented for "a full blown comparison," the hair fragments showed characteristics of a mix of Negroid and Mongoloid features. A Crime Lab serologist testified that Grissom's head, chest, and pubic hair displayed a mixture of Negroid and Mongoloid features.

Also on Wednesday afternoon, the police processed Rusch and Brown's apartment, which was described as clean and well kept. The police gathered several items for testing, including the bedding from each bedroom and a hairbrush from each of the bathrooms.

The serologist concluded that a pubic hair found in the bedding taken from Rusch's bedroom and a pubic hair found in the bedding taken from Brown's bedroom was consistent with Grissom's pubic hair. As previously mentioned, Grissom's hair exhibited a unique mixture of Negroid and Mongoloid characteristics. Furthermore, the serologist specifically mentioned that the hair samples from Grissom indicated the hair either had been cut or shaved. The pubic hair found in the bedding had been cut.

The serologist analyzed hair from each of the brushes, noting that the hair from each brush appeared to belong to one individual. There were no known hair samples available for Rusch and Brown. Nonetheless, the hair taken from the brush found in Rusch's bathroom matched the head hair found on the bedding in Rusch's bedroom, and the hair taken from the brush found in Brown's bathroom matched the head hair found on the bedding in Brown's bedroom. The hair taken from the brush found in Rusch's bathroom will be referred to as hair from the Rusch environment, and the hair taken from the brush found in Brown's bathroom will be referred to as hair from the Brown environment.

On June 30, 1989, the police searched the locker at the South Metcalf Mini Storage and primarily found painting supplies. There was also an orange shag carpet on the floor of the locker. Thibodo failed to mention to the police until late July that on June 28 he had made a trip to the South Metcalf Mini Storage to get painting supplies. On June 28 Thibodo noticed the lock on the door was missing. Inside the locker, he found a wad of duct tape and a pair of sunglasses. He threw the tape on the roof of the storage locker and put the sunglasses in his pickup. In July, Thibodo showed the police where he had thrown the duct tape and turned over the sunglasses. At trial, one of Rusch's friends said she thought the sunglasses belonged to Rusch. The sunglasses appeared identical to a pair Rusch had bought when the friend was with her.

The Crime Lab processed the locker on August 1, 1989. A search for trace evidence proved negative. At that time, the locker was empty. The owner of South Metcalf Mini Storage had removed the carpet in late July. The carpet was turned over to the police on August 2. Thibodo testified that the carpet was from one of the apartments at Trafalgar Square. The carpet was examined for trace evidence. The serologist testified that head hair taken from the carpet was "indistinguishable" from hair from the Rusch environment. No hair taken from the carpet was consistent with hair from the Brown environment.

Over 100 strands of head hair were attached to the duct tape. At trial, the serologist noted that most of the duct tape hair had been exposed to heat and ultraviolet light, which impaired his ability to compare the hair. He said that although the hair attached to the duct tape was "somewhat consistent" with hair from the Rusch environment, there were also "significant differences." Therefore, the serologist was unable to make an exact match.

On July 1, 1989, the police processed Grissom's apartment. One officer described the general appearance of the apartment as "almost ransacked." Very few items of clothing were found in the apartment. A typewriter from which the ribbon had been removed was found. A typewriter ribbon had been found in the brown Toyota. In Grissom's apartment, the police also discovered a plastic container for a Crosman air pellet pistol, a blister pack

for the gun, CO2 cartridges and pellets, and receipts for most of these items.

On July 7, 1989, Grissom was arrested at the Dallas-Fort Worth airport. At the time of his arrest, Grissom had $2,037 in cash in his wallet. Grissom also was found to be in possession of a Pontiac Grand Am, which he admitted stealing from an apartment complex parking lot in Grandview, Missouri, on June 28. Officers found a bag on the back seat of the vehicle that contained a CO2 pellet pistol, two stainless steel knives in sheathes, a box knife with a retractable blade, a claw hammer, black gloves, a yellow nylon rope, duct tape, and wet wipes. Inside the glove compartment, officers found a package of Crosman air pistol pellets and a package of CO2 cartridges for the pistol.

Michael Napier, a special agent with the FBI, testified that after he read Grissom his *Miranda* rights, Grissom agreed to talk with him. A Leawood, Kansas, detective also was present for most of the eight-hour interview. Napier did not tape the interview or take notes during it. At trial, Napier gave the following account of Grissom's statement, which the Leawood detective corroborated.

At the beginning of the interview, Napier showed Grissom a picture of Butler and asked whether he knew her. Grissom replied that he did not know her, did not know where she lived, had not been in her apartment, and had had no contact with her. When asked about Butler's rental car, the maroon Corsica, Grissom said he came into possession of the car through Thibodo. Grissom stated that when he met Thibodo at a Capitol Federal Savings location in the early morning hours of June 18, 1989, Thibodo was in possession of the car, the ignition key, and a purse. Grissom found an ATM card in the purse and, by looking through the contents of the purse, was able to determine the personal identification number. Grissom stated he agreed to give Thibodo 40 percent of any withdrawals and subsequently made three withdrawals, each for $300. Grissom said Butler was not present during any of the transactions.

Napier then showed Grissom pictures of Rusch and Brown. Grissom acknowledged that he knew Rusch and knew she had lived at Trafalgar Square because he had seen her when he had painted at that complex. He insisted, however, that he had had

no contact with Rusch. Grissom said he knew Rusch had a roommate, but did not know the roommate's name until he came into possession of Brown's purse.

Grissom said that early Monday morning after his confrontation with the Lawrence police, he had Thibodo drop him off at Trafalgar Square Apartments, where he found a compact Dodge car with its engine running and a purse on the front seat. Grissom drove the vehicle to the nearby Motel 6 parking lot. While he was waiting for Thibodo, Grissom rummaged through the purse, looking for something of value. Grissom found no ATM card, but recalled seeing a couple of major credit cards. Grissom denied driving around town with Rusch cashing checks.

Grissom initially stated that he had waited 15 minutes for Thibodo; he then stated he had waited approximately an hour. Grissom said he thought Thibodo might have gone toward Rusch and Brown's apartment. When asked why Thibodo might do that, Grissom responded that through the painting business they had obtained keys to Rusch and Brown's apartment and had kept them for future use. Grissom would not explain what he meant by future use. Grissom said he left the Dodge vehicle at the Motel 6 parking lot when Thibodo picked him up. Thibodo gave Grissom a ride to his apartment, and they went their separate ways for a time.

Grissom said he then drove his Toyota to the storage locker located in Stanley, where he waited for Thibodo to join him. Grissom stated that when Thibodo showed up, Thibodo was driving a different vehicle and was in possession of yet another purse. The purse belonged to Brown, and an ATM card was found in it. Grissom asserted that Thibodo was to make the withdrawals and then return and split the proceeds with Grissom. Grissom said Thibodo never returned. Grissom eventually returned to his apartment and packed to leave the area because he realized he was wanted by the police.

Grissom said he drove to St. Louis, Missouri, but as soon as he reached that destination, he decided to drive back to the Kansas City area. He drove to an apartment complex in Grandview because he knew the manager of the complex. He stated he immediately was confronted by a maintenance man, who appeared to be suspicious of him. Within minutes the police arrived,

so Grissom fled the area on foot and spent the night in an open field. Grissom said the next morning he stole ·a Pontiac Grand Am from a nearby apartment complex parking lot, drove to his apartment and packed a few items, and then drove to Texas.

Grissom denied having killed the three Johnson County women, stating, "I could not do that." Another reason Grissom gave was that he thought the women still were· alive. After Napier explained why he thought it was unlikely that the women were alive, Grissom said more than once, "They're not dead." At one point, Grissom added, "Well, they probably are by now." Napier's attempts to get Grissom to explain the last statement were met by Grissom's repeated comment, "You will dig them up. You will dig them up." Grissom would not explain further.

Napier attempted to convince Grissom that the best thing Grissom could do for himself would be to tell the police everything he knew, including how and why the women died as well as the location of the bodies. Grissom responded, "What is in it for me?" At the conclusion of the interview, Grissom asked Napier to relay to the prosecutor that Grissom "could give them the whole package" and that two other people were involved. Grissom identified the others as Thibodo and a man from the City Union Mission, named George, who had worked as a painter. Grissom also told Napier that "everything happened in Kansas and nothing would be found in Missouri." According to the Leawood detective who was present during the interview, Grissom specified that the women would be found in Johnson County and that all of the crimes had occurred in Johnson County.

At no point during the interview did Grissom actually confess to injuring or killing the three Johnson County women.

Prior to trial, the State filed a motion, pursuant to K.S.A. 60-455, to admit evidence of a prior incident involving the attempted abduction of Michelle Katf. The trial court ruled that the evidence was admissible to show identity, plan, preparation, or opportunity.

In June 1989, Katf resided alone at Apple Creek Apartments in Kansas City, Missouri, in a third-floor apartment. On June 11, 1989, Katf's fiance spent the evening with Katf at her apartment and left about 11 p.m. Katf locked the deadbolt on the door when he left. The deadbolt was the only lock on the door, and Katf

testified that she routinely locked the deadbolt. The only other door to the outside was a sliding glass door to her balcony. She kept a piece of wood in the track of the sliding glass door to prevent the door from being opened.

Katf went to bed around midnight. Between 2:00 and 2:30 a.m., Katf awoke to find the overhead bedroom light turned on and a man standing in the doorway. The assailant jumped on the bed, and they struggled. Katf screamed. The assailant covered Katf's mouth and whispered she should be quiet because he had a gun and would use it. Katf quit fighting. The assailant placed the gun in front of her face and allowed her to touch it. Katf testified that she "got a good look or feel of the gun." She also noticed the man was wearing black gloves. The assailant ordered Katf to put a jacket on and told her they were leaving the apartment.

The assailant directed Katf out of the apartment and down the exterior stairway. Katf testified that she thought, "I have to get away. I cannot go with this guy. It's going to be bad if I go away with him." Katf started struggling and told her assailant that she did not believe the gun was real because it felt like plastic rather than metal. She then started screaming. The assailant aimed the gun at her and fired, but Katf was not injured. Each time the trigger was pulled, it made a snapping sound. The assailant then hit Katf several times on the head, once with enough force that a piece of the gun broke off. Katf said her assailant seemed scared and started to flee, but came back to pick up the broken-off piece of the gun before taking off. Within a minute, Katf saw a brown Japanese-type car with a hatchback drive by very fast with its lights off. Several weeks after the attack, when shown a photograph of Grissom's brown Toyota, Katf said she was 90 to 95 percent positive that this was the vehicle she had seen drive by after the attack.

Thomas Haynes and his fiancee lived in the apartment adjacent to Katf's. Haynes testified that during the night Katf was attacked, he and his fiancee were awakened by a loud scream coming from the adjacent apartment. A few minutes later, they heard more screaming, which sounded like it came from outside. Haynes looked out a window and saw a man, whom he thought was carrying something, walking to the far side of the parking lot.

Haynes only saw the back of the man. Haynes watched the man get into a brown 1980 to 1982 Toyota Corolla hatchback and hastily drive out of the parking lot without any lights on. At trial, Haynes identified a photograph of Grissom's brown Toyota as the car he had seen leaving the parking lot after the attack.

After the attack, Katf noticed there were no signs of forced entry into her apartment. She testified that her fiancee was the only individual to whom she had given a key to her apartment.

At trial, Katf said she did not get a good look at the face of her assailant. Katf described her assailant as 5'10" with dark brown hair and an athletic build. Katf said Grissom's physical characteristics were consistent with those of the man who had attacked her. When Katf gave her statement to the police after the incident, in addition to the characteristics already mentioned, Katf said she thought the man was white. At trial, Katf explained her initial impression that her assailant was white was based upon a brief glimpse of the skin color of his inner arm next to the black glove. When discussing the incident with her fiance the day after the attack, Katf's fiance testified that Katf told him she could not pinpoint her assailant's race and described him as "either a light dark-skinned or a dark light-skinned person."

On June 12, 1989, Haynes described the man he had seen "as either being light-complected black or very dark tan Caucasian." Less than two weeks later and after seeing Grissom's picture in the media, Haynes told a Lenexa detective he thought the individual he had seen was Grissom. At trial, Haynes said it was his opinion that Grissom was the man he had seen in the parking lot.

The day after the attack, Katf and her fiance found a knife and a flashlight in her bedding. A week or so later, her fiance found two pellets on the ground near the stairway where the altercation had occurred. Katf was shown several different handguns by a detective. Katf identified a Crosman air pellet pistol as similar to the gun used by her attacker. When the police searched Grissom's apartment on July 1, 1989, they found the original packing for a Crosman air pellet pistol, pellet ammunition, and a receipt for both items. The receipt indicated the gun and ammunition had been purchased about 10 hours before the attack on Katf.

Gina Kelly, the manager of Apple Creek Apartments at the time of the attack on Katf, testified that several months prior to the attack on Katf, Grissom had been employed to paint at the complex. Kelly identified a key found on the dash of Grissom's Toyota as a master key to Apple Creek Apartments. When the key was recovered by the police, it had a tag attached with the words "Apple Creek" written on it. The State's handwriting expert testified it was his opinion that Grissom wrote the words "Apple Creek" on the tag.

After a jury trial in the fall of 1990, Grissom was convicted of three counts of first-degree murder, one count of aggravated kidnapping, four counts of robbery, two counts of aggravated burglary, and one count of misdemeanor theft. The jury acquitted Grissom of the burglary of the Carla Dippel residence. Grissom was sentenced to life for each count of first-degree murder and aggravated kidnapping, 15 to 60 years for each count of robbery and aggravated burglary, and 1 year for misdemeanor theft. The trial judge ordered the sentences to be served consecutively.

## I. CORPUS DELICTI

Grissom argues that the State failed to establish the corpus delicti for homicide. Much of his argument is based upon the fact that bodies have not been found, that the exact events leading up to the deaths of the three women are not known, and that the State's case rests upon circumstantial evidence.

"In homicide cases the corpus delicti is established by proof of two facts: that one person was killed, and that another person killed him. *State v. Pyle* 216 Kan. 423, 432, 532 P.2d 1309 (1975); *State v. Phippen,* 207 Kan. 224, 229, 485 P.2d 336 (1971); *State v. Doyle,* 201 Kan. 469, 477, 441 P.2d 846 (1968). The corpus delicti may be proved by direct testimony, by indirect or circumstantial evidence, or by a combination of both. *State v. Pyle,* 216 Kan. at 432." *State v. Henderson,* 226 Kan. 726, 731, 603 P.2d 613 (1979).

See *State v. Bird,* 240 Kan. 288, 299, 729 P.2d 1136 (1986), *cert. denied* 481 U.S. 1055 (1987); *State v. Yarrington,* 238 Kan. 141, Syl. ¶¶ 6, 7, 708 P.2d 524 (1985).

"Circumstantial evidence is evidence that tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue, and therefore affords a basis for a reasonable inference by the jury or court

of the occurrence of the fact in issue. [Citation omitted.]" *State v. Flinch-paugh*, 232 Kan. 831, 835, 659 P.2d 208 (1983).

Grissom cites *State v. Doyle*, 201 Kan. 469, 478-79, 441 P.2d 846 (1968), for the proposition that in order to prove corpus delicti, all evidence must be consistent with the defendant's guilt and inconsistent with the defendant's innocence. The *Doyle* court was referring to death by suicide or natural causes as theories inconsistent with the defendant's guilt. Grissom, however, does not argue that the deaths of the three women were due to natural causes or suicide. More importantly, Grissom does not mention that subsequent decisions have clarified the *Doyle* case. See *State v. Henderson*, 226 Kan. at 732 (In establishing the corpus delicti, the United States Supreme Court has rejected "the theory that the prosecution is under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt."); see also *State v. Morton*, 230 Kan. 525, 638 P.2d 928 (1982); *State v. Foster*, 229 Kan. 362, 623 P.2d 1360 (1981); *State v. Knoxsah*, 229 Kan. 36, 622 P.2d 140 (1981); *State v. Johnson*, 222 Kan. 465, 565 P.2d 993 (1977); *State v. Sparks*, 217 Kan. 204, 535 P.2d 901 (1975); *State v. Sagebiel*, 206 Kan. 482, 480 P.2d 44 (1971).

The most pertinent case is *State v. Pyle*, 216 Kan. 423, 532 P.2d 1309 (1975). In *Pyle*, the defendant, Mike Pyle, was convicted of the first-degree murder of his grandmother, Goldie Millar. Mrs. Millar's body was never recovered, and on appeal, Mike raised the issue of whether the State had established the corpus delicti. In discussing circumstantial proof of corpus delicti, the *Pyle* court stated:

" 'The elements must be established independently of admissions or confessions of the defendant . . . but as a basis for introduction of the defendant's confession or admission, the prosecution is not required to establish corpus delicti by proof as clear and convincing as is necessary to establish guilt; a slight or prima facie showing is sufficient. [Citations omitted.] . . . It is for the trial court to determine whether a prima facie showing has been made. [Citations omitted.]' " 216 Kan. at 432-33.

This court held that the corpus delicti had been established, based in part upon the following evidence:

"[T]he fact that [Goldie] was never heard from after April 5 by her friends and customary associates; the strained relations between Mike and Goldie;

the carefully constructed alibi consisting of his fabricated charges of drunkenness and the all-night trip to Colorado; the false-alarm fire of two days before; Mike's avowed intention to get the ranch 'one way or the other'; and ultimately his premature display of knowledge of the fire and her death. Some of this evidence served a dual purpose; it not only showed that Goldie was dead by criminal means, but pointed the finger of guilt at Mike." 216 Kan. at 433.

Grissom argues that the State failed to make a prima facie showing of the corpus delicti for the homicide for each of the three murder charges. The essence of Grissom's argument is that the circumstantial evidence presented is insufficient to link him to the deaths of the three women. Grissom primarily is arguing sufficiency of the evidence, not corpus delicti.

Although evidence establishing the corpus delicti often is intertwined with evidence establishing the identity of the killer, it is not necessary to establish the killer's identity in order to establish the corpus delicti. Here, in order to establish the corpus delicti, the State only needed to prove that Butler, Rusch, and Brown were killed by criminal means, not that Grissom was the killer. Grissom's claim that the State failed to link him to the deaths of the three women will be discussed shortly.

The deaths of Butler, Rusch, and Brown by criminal means are established in part by the fact that family and friends never heard from Butler after June 18, 1989, and from Rusch or Brown after June 26, 1989, and that such behavior was atypical. Circumstances unique to the disappearance of each is discussed below; however, there is also much similarity among the women and their lifestyles. All three women were single and lived in apartments in Johnson County. Each woman had maintained close contact with her family prior to her disappearance. Each woman was considered reliable and responsible. All three had discussed future plans with family and friends. There was no indication any of the women were depressed or would be inclined to leave the area without word to anyone. There was no indication Butler, Rusch, or Brown suddenly had moved. For example, the kitchens in both apartments were stocked with food and there was no indication anything had been taken from either apartment. Neither Butler's apartment nor Rusch and Brown's apartment showed signs of a struggle or forced entry; however, keys to both apart-

ments were found in Grissom's car. There is evidence Grissom previously had used a master key to enter Rusch and Brown's apartment under false pretenses.

There are additional facts supporting the State's theory that Butler's death was by criminal means. When Butler left Becker's apartment at 4 a.m. on Sunday, June 18, Butler told Becker she was going home to go to bed. The clothes Butler had been wearing when she left Becker's were found in the bedroom of Butler's apartment. Around the time that Butler would have arrived home or shortly thereafter, Butler's neighbor, who lived in the apartment below Butler, was awakened by a loud "thump" noise coming from above her. All of the money from Butler's checking account was withdrawn at unusual hours over a three-day period in the maximum allowed increments. The first withdrawal occurred within two hours of when Butler left Becker's apartment. Butler did not show up for work or call in the following Monday. Butler's rental car was stolen. Traces of blood, which were linked to Butler through reverse style paternity testing, were found in the trunk of the rental car.

There are additional facts supporting the State's theory that Rusch's death was by criminal means. When Rusch left a club, where she had spent the evening with friends, after midnight on June 26, she told a friend she was going home to bed because she had to go to work the next day. Rusch withdrew $2,400 from her money market account in four withdrawals between 7:58 and 8:43 a.m. on June 26. Another bank customer, who was in the drive-up lane at approximately the same time as when Rusch made her first withdrawal, said he noticed a car with a white woman driver and a black male passenger. Shortly after making the last transaction, Rusch called in sick to work on the morning of June 26. Neither Rusch nor her roommate, who supposedly also was ill, answered their door or telephone on June 26 and thereafter. Rusch's car was not parked in her apartment complex parking lot. On the evening of June 26, Rusch was photographed using Brown's ATM card and looking grim and disheveled. In the background of the photograph and behind Rusch, part of a car could be seen with its lights on.

When Rusch's father entered her apartment on Tuesday morning, June 27, he found no one in the apartment, but noticed a

curling iron was turned on in one of the bathrooms. When the apartment was searched later, a pubic hair consistent with Grissom's pubic hair was found in Rusch's bedding. Also on Tuesday, credit cards and personal papers belonging to Rusch were found in a ditch in southern Johnson County, and Rusch's driver's license was found near I-435 in southern Kansas City. On June 28, when Grissom's car was searched, the police found a credit card in Rusch's name, several keys to her apartment, and a key to her parents' house. Three of her rings were discovered in the glove compartment. Rusch's car was located June 28 in a motel parking lot near the complex where she had lived. The car had a new dent with blue paint in it. The blue paint was matched to the Mini Warehouse in Raytown, a location to which Grissom was linked. Several hair fragments, which displayed the same characteristics as Grissom's hair, were found in Rusch's car. A pair of sunglasses found in a South Metcalf Mini Storage locker, which Grissom had rented, was identified as belonging to Rusch. Hair found on a carpet, which had been found in that locker, was indistinguishable from hair taken from a hairbrush found in Rusch's bathroom.

There are additional facts supporting the State's theory that Brown's death was by criminal means. Brown had a serious, romantic relationship with Mike Raunig. Raunig never heard from nor saw Brown again after she left his place about 6 a.m. on June 26 to return to her apartment and get ready for work. The T-shirts she was wearing when she left Raunig's house were found in her apartment on her bedroom floor. The manager of the Mini Warehouse in Raytown testified that the woman who signed a rental agreement as Christine Rusch on June 26 looked much like the photograph of Brown. The manager said the woman seemed distressed and looked to the man who was accompanying her for assistance in completing the form.

Brown also did not show up for work on June 26. A woman, who identified herself as Brown's roommate, called and said Brown was sick. Brown did not show up for lunch at her sister's house or call her. Despite repeated attempts to contact Brown, neither Brown nor Rusch, who supposedly also was ill, answered their door or telephone on June 26 or thereafter. Brown's car, however, was continually parked in front of her apartment build-

ing. When the apartment was searched later, a pubic hair consistent with Grissom's pubic hair was found in Brown's bedding. When Grissom's car was searched, a credit card in Brown's name and keys to Rusch and Brown's apartment were discovered.

Once the State established a prima facie showing of the corpus delicti for homicide on each murder count, which the State did here, the State then could introduce evidence of any admission by Grissom. See *Pyle*, 216 Kan. at 432-33. Although Grissom never admitted to injuring or killing the three women, he did indicate during his statement in Texas on July 7, 1989, that the women probably were dead by now and that their bodies were buried. This supports the conclusion that each of the women had been killed by criminal means.

The corpus delicti for homicide on each of the three counts of murder was established.

Identifying the killer is not required to establish the corpus delicti for homicide. As already mentioned, Grissom's argument that the State failed to prove he was the killer is a sufficiency of evidence issue. His sufficiency argument is not persuasive. Grissom attempts to discredit the circumstantial evidence connecting him to the murders by analyzing each link in a vacuum and not in the context of a bigger picture or a pattern of behavior. This court declines to follow suit.

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Zimmerman*, 251 Kan. 54, Syl. ¶ 1, 833 P.2d 925 (1992).

In viewing the evidence in the light most favorable to the State, it is clear the State established a pattern of behavior. A rational factfinder could find that Grissom entered the victims' apartments with keys he had acquired, surprised them, and threatened them with a gun or knife. Physical evidence linked Grissom to Butler's apartment (the gold rope necklace) and to Rusch and Brown's apartment (the pubic hair found in each woman's bedding). Shortly after Grissom's alleged contact with Butler, Rusch, and Brown, significant amounts of money were withdrawn from each woman's bank account. Based upon the evidence, a jury could rationally conclude that either with or without the

victims' assistance, Grissom acquired this money. Additionally, a jury could rationally decide that theft or robbery provided a motive for the murders.

In addition to the evidence already discussed, there are other facts that connect Grissom to the three victims. Grissom was linked to Butler's car and to Rusch's car. Grissom correctly contends that his possession of Butler's rental car only justifies a presumption that he stole the car, not that he killed Butler. A rational factfinder, however, could find that the traces of blood found in the car trunk and linked to Butler, coupled with Butler's disappearance, added up to murder.

A jury could rationally link Grissom to Rusch's murder. There was evidence suggesting he was with her when she cashed the checks on the day of her disappearance and suggesting a connection between Rusch and Grissom's storage locker in Stanley, in which Rusch's sunglasses and hair were found. Furthermore, one of Rusch's credit cards and three of her rings were found in Grissom's car.

A jury could rationally link Grissom to Brown's murder, based on the fact that she was seen with him on the day she disappeared, that she appeared distressed, and that one of her credit cards later was found in Grissom's car.

It is not necessary that every fact point directly and independently to Grissom's guilt. It is enough if the jury's conclusion is warranted by combined and cumulative force of all incriminating circumstances. The jury was not bound to accept the State's version of what happened, but having convicted the defendant, it must be presumed the jury believed the State's evidence and drew from the evidence all inferences favorable to the State. See *State v. Ridge*, 216 Kan. 73, 530 P.2d 1213 (1975). The State presented sufficient evidence for a rational factfinder to link Grissom with the three women, to identify him as the killer, and to convict him of the three charges of first-degree murder beyond a reasonable doubt.

## II. JURISDICTION ON MURDER CHARGES

On appeal, Grissom renews his claim that the District Court of Johnson County, Kansas, lacked jurisdiction to prosecute him on the three murder charges because no evidence was presented

at trial concerning the location of the alleged killings and because the three women were last seen alive in Missouri. At the conclusion of the State's case, Grissom moved for a judgment of acquittal on the murder charges, which the trial court denied. Based upon the same grounds, Grissom subsequently filed a motion to arrest judgment, which also was denied.

Grissom acknowledges the testimony of FBI Agent Napier and the Leawood detective who interviewed him after his arrest in Texas. Napier testified that Grissom said "everything happened in Kansas and nothing would be found in Missouri." According to the Leawood detective, Grissom specified that the women would be found in Johnson County and that everything happened in Johnson County. No evidence was introduced at trial to dispute Napier's and the detective's testimony.

Based upon Napier's and the detective's testimony, the State argues that Grissom conceded jurisdiction. Grissom, on the other hand, contends his uncorroborated extrajudicial statement cannot be relied upon to establish jurisdiction. In support of his contention, Grissom cites *Opper v. United States*, 348 U.S. 84, 90, 99 L. Ed. 101, 75 S. Ct. 158 (1954) ("We think that an accused's admissions of essential facts or elements of the crime, subsequent to the crime, are of the same character as confessions and that corroboration should be required."), and *State v. Tillery*, 227 Kan. 342, 346, 606 P.2d 1031 (1980) ("An uncorroborated extrajudicial confession is insufficient to sustain a conviction."). Neither *Opper* nor *Tillery* involved jurisdictional issues.

Our territorial jurisdiction statute provides, in pertinent part:

"(1) A person is subject to prosecution and punishment under the law of this state if:

(a) He commits a crime wholly or partly within this state; or

(b) Being outside the state, he counsels, aids, abets, or conspires with another to commit a crime within this state; or

(c) Being outside the state, he commits an act which constitutes an attempt to commit a crime within this state.

(2) An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. If the body of a homicide victim is found within the state, the death is presumed to have occurred within the state." K.S.A. 21-3104.

Grissom frames his argument as follows: "[D]oes Kansas have jurisdiction over alleged homicides apparently committed in Missouri where the state's theory of the case is that the victims were abducted by the defendant in Kansas?" Grissom maintains the murders occurred in Missouri because the women were last seen alive in Missouri: Rusch, when she was photographed making an ATM withdrawal in Belton, Missouri, on the evening of June 26, 1989; Brown, at the Mini Warehouse in Raytown, Missouri, on the morning of June 26, 1989; and Butler, when she left her friend's apartment in Kansas City, Missouri, in the early morning hours of June 18, 1989. Although no one actually saw Butler at her Overland Park, Kansas, apartment after leaving her friend's place, Grissom wants us to ignore the fact that the clothes Butler had on when she left her friend's place were found in her apartment bedroom.

The State contends the emphasis should be on where the chain of events originated. The State claims the chain of events began with the victims' abductions in Kansas: The State maintains that Butler did make it back to her Overland Park apartment because the clothes she had been wearing when she left Missouri were found in her bedroom. Brown was last seen by her boyfriend at his Johnson County residence. Plus, the T-shirts Brown was wearing when she left her boyfriend's place were found on the bedroom floor of her apartment. Rusch was last seen before her disappearance at an Overland Park nightclub. According to the State, the evidence suggests Rusch was at least "held" at the storage locker in southern Johnson County. For further support, the State points out the fact that the other crimes in this case took place in Kansas: the aggravated kidnapping of and robberies involving Rusch, the aggravated burglaries of Butler's apartment and Rusch and Brown's apartment, and the misdemeanor theft.

In support of its contention, the State cites cases from several states. In *State v. Kills On Top*, 241 Mont. 378, 787 P.2d 336 (1990), the victim was kidnapped in Montana and murdered in Wyoming. The Supreme Court of Montana rejected the defendant's jurisdiction argument, stating: "The evidence in this case clearly establishes the commission of aggravated kidnapping in Montana, the death in Wyoming, and a causal connection be-

tween the aggravated kidnapping and death." 241 Mont. at 388. Montana and Kansas have similar jurisdiction statutes.

In *State v. Lane*, 112 Wash. 2d 464, 771 P.2d 1150 (1989), the victim was kidnapped in Washington, but murdered in an area in which the federal government had exclusive jurisdiction. The Washington Supreme Court rejected the defendant's jurisdiction argument, stating that Washington had jurisdiction over crimes if an "essential element" of the crime occurred in Washington. The court determined that premeditation was an essential element of first-degree murder and that the State had proved premeditation occurred in Washington. Washington and Kansas have similar jurisdiction statutes. "The purpose of [the Washington statute] is to eliminate twilight zones affording safe haven to persons who commit offenses partly within this state and partly without it." *State v. Swanson*, 16 Wash. App. 179, 189, 554 P.2d 364 (1976), *cert. denied* 434 U.S. 967 (1977).

In *Smith v. State*, 101 Nev. 167, 697 P.2d 113 (1985), the defendant kidnapped the victim in Nevada and then transported her to California where he sexually assaulted and attempted to murder her. In rejecting the defendant's jurisdiction argument, the Nevada Supreme Court stated that the defendant's "actions in Nevada were themselves criminal in nature and were a necessary and integral part of a larger crime plan to assault and murder the victim." 101 Nev. at 169. In other words, if "a defendant commits criminal acts in Nevada which are a substantial and integral part of an overall continuing crime plan, and which are clearly in 'partial execution' of the plan," then Nevada has jurisdiction. 101 Nev. at 169.

In *People v. Cullen*, 695 P.2d 750 (Colo. App. 1984), the victims were kidnapped in Colorado and killed in New Mexico. The appellate court upheld the defendant's murder convictions, reasoning that "deliberation, an essential element of the crime of first degree murder, occurred within Colorado." 695 P.2d at 751-52.

In *Conrad v. State*, 262 Ind. 446, 317 N.E.2d 789 (1974), the victim was assaulted and kidnapped in Indiana, but the blows from which he died were delivered in Ohio at a place on State Line Road. The Supreme Court of Indiana rejected the defendant's jurisdiction argument, reasoning: "There was substantial

evidence presented from which the jury could find that the assault and abduction of the victim were integrally related to the victim's murder. Thus viewed, the assault and abduction provide an adequate jurisdictional base for [the defendant's] conviction of murder in . . . Indiana." 262 Ind. at 451.

The line of cases cited by the State is persuasive and consistent with our broad interpretation of the territorial jurisdiction statute. See *State v. Henwood*, 243 Kan. 326, 330, 756 P.2d 1087 (1988) ("K.S.A. 21-3104[1] requires that a defendant have some connection with the State of Kansas in order to permit a prosecution of that person for violations of the Kansas Criminal Code."). Additionally, the Judicial Council's comment to K.S.A. 21-3104 states:

"Subsection (1)(a) applies where all or part of a crime is committed in the state. Where the entire crime is committed in Kansas, there is no problem of jurisdiction. However, this subsection, as amplified by subsection (2) makes it clear that the state has jurisdiction where any element or the result of the crime occurs in Kansas. Under (1)(a) two states may have concurrent jurisdiction over the same crime."

A broad interpretation of the territorial jurisdiction statute is consistent with our venue statutes. Although jurisdiction and venue are different, an analogy can be made to the venue statutes. For example, if a crime is committed in two counties, either county has venue. K.S.A. 22-2603. If a crime is committed on or so near the boundary of two counties that it cannot be determined in which county the crime occurred, either county has venue. K.S.A. 22-2604. If the cause of death is inflicted in one county and the victim dies in another county, either county has venue. K.S.A. 22-2611. In discussing venue, this court has said, "A murderer should not escape punishment because the exact place of his crime is concealed." *State v. Zimmer*, 198 Kan. 479, 499, 426 P.2d 267, *cert. denied* 389 U.S. 933 (1967). The same rationale applies here.

There is evidence from which a jury could find that Grissom committed criminal acts in Kansas which were a substantial and integral part of an overall continuing crime plan and which were in partial execution of the plan. For example, a jury could find that the abduction of the women occurred in Kansas and that

the abductions were related integrally to the murders. Grissom's jurisdiction argument fails.

## III. SUFFICIENT EVIDENCE FOR
## MURDER CONVICTIONS

Grissom was charged with killing Butler with premeditation and deliberation or, in the alternative, during the perpetration of the felony of aggravated burglary. Grissom was charged with killing Rusch and Brown with premeditation and deliberation or, in the alternative, during the perpetration of the felony of aggravated burglary or aggravated kidnapping. He argues that because there is no evidence the killings occurred during the perpetration or attempted perpetration of the aggravated burglaries and because the jury returned a general verdict, it is impossible to tell whether the jury relied upon legally sufficient grounds to convict him of murder.

In support of his argument, the defendant cites *State v. Garcia*, 243 Kan. 662, Syl. ¶ 6, 763 P.2d 585 (1988), in which this court held that "[a] general verdict of guilty must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient." Garcia had been charged with killing the victim while burglarizing either a house or a pickup, two separate and distinct burglaries. This court concluded the evidence did not support a burglary of the pickup and reversed Garcia's convictions for burglary and for felony murder based upon that burglary.

The *Garcia* court relied upon *Stromberg v. California*, 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532 (1931), in which the jury returned a general verdict, convicting Stromberg of violating a California penal statute that condemned the display of a red flag for any of three purposes. Stromberg challenged the constitutionality of the statute. The California appellate court upheld the conviction even though it questioned the constitutionality of one of the three purposes. The California court concluded that even if one of the purposes was unconstitutional, that provision of the statute could be severed, saving the rest of the statute and the conviction. The United States Supreme Court disagreed, reasoning:

"As there were three purposes set forth in the statute, and the jury were instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. . . . It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." 283 U.S. at 368.

We distinguished *Garcia* in *State v. Davis*, 247 Kan. 566, 571-72, 802 P.2d 541 (1990), stating:

"There is a distinction between *Garcia's* rationale that there must be sufficient evidence to convict for both of the separate crimes alleged in the complaint as the underlying crime for proof of felony murder and whether a defendant committed the underlying crime of aggravated robbery by one of several distinct statutory methods, *i.e.*, by force or threat, that constitute the crime of aggravated robbery."

Based upon *State v. Pioletti*, 246 Kan. 49, 785 P.2d 963 (1990), the instant case has more in common with *Davis* than *Garcia*. The *Pioletti* court stated:

" 'When an accused is charged in one count of an information with both premeditated murder and felony murder it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilt by reason of the killer's malignant purpose.' *We have further held that the State is not required to elect between premeditated and felony murder, as K.S.A. 21-3401 established the single offense of murder in the first degree, and only provides alternative methods of proving the crime.*" 246 Kan. at 64. (Emphasis added.)

Here, the question does not involve whether there was sufficient evidence to convict Grissom of separate felonies that would support a conviction for felony murder. The question is whether there was sufficient evidence to convict Grissom of three counts of the single offense of first-degree murder. Proof that Grissom committed first-degree murder can be shown by either one of two distinct statutory methods—premeditation or felony murder. The State is not required to prove a defendant committed *both* premeditated and felony murder.

Furthermore, we are no longer bound by our earlier interpretation of *Stromberg*. The United States Supreme Court, in *Griffin v. United States*, 502 U.S. \_\_\_, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), recently clarified the *Stromberg* holding.

In *Griffin*, the issue was whether "a general guilty verdict on a multiple-object conspiracy charge must be set aside if the evidence is inadequate to support conviction as to one of the objects." 116 L. Ed. 2d at 375. In reviewing the case law pertaining to general verdicts, the United States Supreme Court determined that the above-quoted language from *Stromberg* and the case's holding "do not necessarily stand for anything more than the principle that, where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." 116 L. Ed. 2d at 379. The *Griffin* court noted that the petitioner was seeking to expand the principles developed in *Stromberg* and subsequent cases. "Petitioner cites no case, and we are aware of none, in which we have set aside a general verdict because one of the possible bases of conviction was neither unconstitutional as in *Stromberg*, nor even illegal as in *Yates* [v. *United States*, 354 U.S. 298, 1 L. Ed. 2d 1356, 77 S. Ct. 1064 (1957)], but merely unsupported by sufficient evidence." 116 L. Ed. 2d at 380. The United States Supreme Court rejected the petitioner's claim, reasoning:

"Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence [citation omitted]. . . .

"[I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction." 116 L. Ed. 2d at 382-83.

Any language in *Garcia* contrary to the language quoted above from *Griffin* is disapproved.

Here, Grissom's challenge to the three first-degree murder convictions is factual. Because he was charged in the alternative, if there is sufficient evidence to convict him of either premeditated or felony murder, the general verdict should be upheld. As illustrated by the evidence discussed in Issue I, there is sufficient evidence to convict Grissom of the premeditated murders of Butler, Rusch, and Brown, and that is sufficient to uphold the jury's general verdict. Therefore, it is not necessary to consider whether there is sufficient evidence to convict Grissom of the felony murders of the three women.

### IV. SUFFICIENCY OF EVIDENCE—ROBBERY

Grissom claims there is not sufficient evidence to support the State's theory that he, by force or threat, coerced Rusch into cashing the four checks and giving the money to him.

Again, the standard of review for sufficiency of the evidence is:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Zimmerman,* 251 Kan. 54, Syl. ¶ 1, 833 P.2d 925 (1992).

Robbery is defined as "the taking of property from the person or presence of another by threat of bodily harm to his person or the person of another or by force." K.S.A. 21-3426.

Grissom does not dispute the evidence that Rusch cashed four checks totaling $2,400 at four different Johnson County branches of the Metcalf State Bank between 7:58 and 8:43 a.m. on June 26, 1989. What the defendant does dispute is that he required Rusch, by force or threat, to cash the checks and to give him the proceeds.

Grissom claims there is no evidence from which a jury could find beyond a reasonable doubt that he accompanied Rusch when she cashed the checks. The only testimony potentially linking Grissom to being in the car with Rusch when she cashed the checks was from another bank customer, who was making a deposit at the same time Rusch was cashing her first check. The customer testified that he noticed a car in the far right drive-up lane in which the driver was a white woman and the passenger

was a black male. The customer said the car with the two passengers stuck in his mind because there were only a few cars in the drive-up lines that morning and because, based on his observations while making the daily deposit for his company, he rarely saw more than one person in a car in the drive-up lanes. The customer, however, was unable to describe the car in which he noticed the two passengers and to identify Rusch as the driver or Grissom as the passenger. Despite what the customer was not able to remember, a jury reasonably could attach significance to the customer's observation, especially when coupled with the timing of the two transactions—the customer made his deposit at 7:57 a.m. and Rusch cashed her check at 7:58 a.m. Thus, as little as one second could have separated the transactions.

No one else remembered or observed Rusch during the cashing of the checks that morning except the teller at the fourth and final transaction. The teller remembered Rusch and commented that Rusch was wearing sunglasses, but could not tell if there was a passenger in the car because the placement of a pole obstructed her view. A pair of sunglasses identified as belonging to Rusch subsequently was found in the storage locker linked to Grissom.

Grissom maintains there was no evidence the alleged taking was by force or threat because Rusch did not indicate that anything was wrong to any of the tellers. A jury reasonably could find other explanations for Rusch's silence just as Grissom contends there are other explanations besides force or threat to explain the deterioration of the quality of Rusch's handwriting between the writing of the first and fourth checks.

Grissom also claims there is no evidence he obtained control of Rusch's $2,400. He says a jury cannot reasonably infer that he obtained control of Rusch's money simply because he was carrying a large amount in cash on him at the time of his arrest.

Again, Grissom analyzes each element of the crime in isolation. In proving its case, the State relied upon establishing patterns of behavior. For example, the evidence established that significant sums of money were withdrawn from each woman's bank account around the time each disappeared. Additionally, a grim and disheveled Rusch was photographed withdrawing money from Brown's account with Brown's ATM card. The jury could also

take into account that Grissom had access to weapons, knives and a Crosman air pellet pistol, and, if the jury believed Katf's assailant was Grissom, that Grissom previously had attempted to frighten another woman by force and threat. Based upon this and other evidence in the case, a jury could reasonably find that Rusch was compelled, by force or threat, to withdraw the $2,400 from her account before disappearing, never to be heard from again.

The robbery convictions are supported by evidence, although circumstantial, from which a rational factfinder could find guilt beyond a reasonable doubt.

## V. SINGLE LARCENY DOCTRINE

At trial, Grissom objected to the four separate instructions on robbery, claiming there was but one robbery because the four transactions were one continuous act. In rejecting Grissom's claim, the trial court reasoned that the robberies occurred at different times and locations, necessitating travel between each occurrence.

On appeal, Grissom claims the trial court erred in not applying the single larceny doctrine to the four counts of robbery. He contends the single larceny doctrine applies to robbery because this court has cited with approval a C.J.S. discussion stating that " 'robbery is merely an aggravated form of larceny or theft.' " *State v. Long,* 234 Kan. 580, 591, 675 P.2d 832 (1984). The context of the C.J.S. discussion was whether theft is a lesser included crime of robbery.

Grissom relies upon the discussion of the single larceny doctrine found in *State v. Roberts,* 210 Kan. 786, 504 P.2d 242 (1972), *cert. denied* 414 U.S. 832 (1973). The *Roberts* court stated:

"When property is stolen by a succession of takings from the same owner and from the same place, each taking is a separate crime if it results from a separate impulse or intent. However, if it appears that a single incriminating impulse or intent is involved in the successive [takings], they constitute a single larceny." 210 Kan. at 791.

See *State v. McClanahan,* 251 Kan. 533, 836 P.2d 1164 (1992). In support of his claim that the four robberies were the result of a single criminal impulse, he directs this court's attention to the fact that, based upon the time between the cashing of each

check and the distance between the various branches of the bank, Rusch apparently drove directly from branch to branch. He points out the similarities among the four transactions.

Grissom, however, overlooks the very language he quotes: "When property is stolen by a succession of takings from the same owner *and from the same place*, each taking is a separate crime if it results from a separate impulse or intent." (Emphasis added.) Here, the robberies did not occur in the same place. *Roberts* is not controlling on the instant facts.

The defendant also maintains the trial court's reliance upon the time and location variances is misplaced because robbery is a crime against persons, not property. He argues what is important is that Rusch was the victim in each count and not that the takings occurred at different branches of the same bank. The defendant cites no authority to support this argument, and none has been found.

The single impulse theory is generally associated with theft cases. Whether it should be limited to theft cases need not be decided here.

The defendant's claim that the four robbery convictions are multiplicitous because they resulted from one criminal impulse also fails.

"A test for determining whether a continuous transaction results in the commission of but a single offense is whether separate and distinct prohibited acts, made punishable by law, have been committed. A single motive for a series of acts does not necessarily result in a single crime." *State v. Scott*, 250 Kan. 350, Syl. ¶ 2, 827 P.2d 733 (1992).

Thus, even if the robberies resulted from a single motive or a single criminal impulse, the jury was not required to find a single crime. "Whether or not the separate acts were the result of one larcenous impulse or plan is a question of fact to be determined by the jury." *State v. Fox*, 242 Kan. 457, 463, 749 P.2d 16 (1988); see *State v. McClanahan*, 251 Kan. 533, Syl. ¶ 2. Here, the jury found the evidence supported four robberies—four separate and distinct prohibited acts.

Grissom's arguments do not provide a legal basis for this court to disturb the jury's findings.

## VI. AGGRAVATED BURGLARY OF BUTLER'S APARTMENT

The trial court instructed the jury that in order to convict

Grissom of the aggravated burglary of Butler's apartment, the State had to prove the following:

"1. That the defendant knowingly entered into or remained in a building, to-wit: the apartment residence of Joan Marie Butler;
2. That the defendant did so without authority;
3. That the defendant did so with the intent to commit a theft therein;
4. That at the time there was a human being in the apartment; and
5. That this act occurred on or about the 18th day of June, 1989, in Johnson County, Kansas."

Grissom claims the evidence does not support that he entered Butler's apartment, that Butler was there at the time of the alleged entry, and that he possessed the intent to commit a theft at the time of the alleged entry.

Although a key to Butler's apartment was found in Grissom's car, he contends there was no evidence he actually entered the apartment because there was no sign of a forced entry. Common sense would tell a jury that if Grissom possessed a key to Butler's apartment, there would be no need for a forced entry. Grissom also points to the fact that no physical evidence, such as fingerprints or hair, directly linked him to Butler's apartment.

Contrary to Grissom's assertions, a rational factfinder could conclude that Grissom had entered the apartment based upon the gold rope necklace found on the floor in Butler's apartment. The same weekend Butler disappeared, another apartment within the complex was burglarized. The occupant of that apartment, Carla Dippel, reported that a gold rope necklace and a peso pendant were missing. Dippel identified the necklace found in Butler's apartment as the one she had bought in Italy. Dippel also identified the peso pendant that Grissom had given his girlfriend as the pendant stolen from her apartment.

Grissom attempts to discredit this evidence because a police officer had not noticed the necklace on Butler's floor when he entered the apartment a couple of days after Butler's disappearance. Grissom places great emphasis on the fact that several people had been in the apartment before the apartment was processed and the necklace found on June 28, 1989, and that he did not give the peso pendant to his girlfriend until June 24, 1989.

The evidence must be viewed in a light most favorable to the prosecution. For example, the officer who entered the apartment on June 20, 1989, testified that he entered the apartment because a missing person report had been filed. The officer said he "was trying to make sure that Miss Butler was not, in fact, in her apartment, that something was not wrong with her." It was his "intention to make sure there wasn't any obvious signs of foul play at that particular point in time." He was not "looking for any small items laying on the floor." He added that if he had noticed the necklace, he might have assumed that Butler had dropped it on the floor.

Grissom contends there is no evidence Butler was in her apartment at the time of his alleged entry. He suggests the significance of finding in her bedroom the clothes she had been wearing when she was last known to have been seen alive is that she returned to her apartment, not that she remained in her apartment after changing. Grissom's suggestion does not take into account the testimony of Celeste Becker, who is the last person known to have seen Butler alive. Becker said that when Butler left Becker's apartment at 4 a.m. on June 18, 1989, Butler told her that she was going to go home and go to bed because she was tired. Between 4 and 5 a.m., the woman who lived in the apartment below Butler's apartment testified that a loud thump-type noise woke her out of a sound sleep and scared her. She said the noise sounded like it came from above her.

Grissom also claims the lack of any signs of a struggle in Butler's apartment suggests Butler may not have been present. If the jury believed Katf's assailant was Grissom, it would have reason to believe Grissom threatened Butler with a weapon, which would explain why there were no signs of a struggle.

Grissom's last claim is that there is no evidence he entered Butler's apartment, if he entered at all, with the intent to commit a theft. Around the time each woman disappeared, significant sums of money were withdrawn from each woman's bank account. Over a three-day period, starting within two hours of when Butler left Becker's apartment on June 18, 1989, three $300 cash withdrawals were made, leaving no money in Butler's checking account. That, coupled with the fact that Grissom was found in possession of Butler's rental car, that three rings belonging to

Rusch as well as credit cards in the names of both Rusch and Brown were found in his car, and that he had given a stolen necklace to his girlfriend, support the theory that Grissom entered Butler's apartment with the intent to commit a theft. The State's evidence established a pattern.

Based upon the evidence presented at trial, a rational factfinder could find beyond a reasonable doubt that Grissom had committed the aggravated burglary of Butler's apartment.

## VII. AGGRAVATED BURGLARY OF RUSCH AND BROWN'S APARTMENT

Grissom claims there was not sufficient evidence to convict him of the aggravated burglary of Rusch and Brown's apartment. The jury instruction concerning the aggravated burglary of Rusch and Brown's apartment was essentially the same as the instruction concerning the aggravated burglary of Butler's apartment.

The standard of review for the sufficiency of evidence previously has been set forth.

Grissom raises the same three arguments as in the preceding issue. He claims there was no evidence he was in Rusch and Brown's apartment on June 26, 1989. To support his "no evidence" claim, he cites to the fact there were no signs of a struggle or forced entry. Several keys to Rusch and Brown's apartment were found in Grissom's car. As discussed in Issue VI, this argument is not persuasive. Unlike Butler's apartment, a pubic hair matching Grissom's pubic hair was found in the bedding in each woman's bedroom. Grissom attempts to lessen the impact of this evidence by arguing there was evidence he had been in Rusch and Brown's apartment before and no evidence concerning how long the pubic hair might have been in the bedding.

Thibodo's testimony established that Grissom had been in Rusch and Brown's apartment around the end of May 1989. Even if the jury accepted the argument that Grissom's pubic hair had been in the apartment since May 1989, no explanation is offered for how his pubic hair ended up in the women's bedding. It is more reasonable for a jury to conclude the bedding had been washed during that one month period than to believe Grissom had lost one pubic hair in each woman's bedding when he entered the apartment under false pretenses at the end of May and that

each pubic hair had remained in the bedding until the police discovered them on June 28, 1989, when the apartment was processed.

Grissom's second complaint is that there was no evidence Rusch or Brown were in the apartment at the time of his alleged entry. He points out that although there was evidence Rusch left a local nightclub between midnight and 12:30 a.m. on June 26, 1989, there is no evidence she ever went to her apartment. The jury no doubt took into account the testimony of Rusch's friend, who stated that Rusch said she had to leave because she had to get up and go to work the next morning. Grissom acknowledges that the T-shirts Brown was wearing when she was last seen alive were found in her bedroom; however, he again suggests Brown could have changed her clothes and left the apartment. There is no evidence to support this supposition. Furthermore, when Brown left her boyfriend's place at about 6 a.m. on June 26, 1989, she indicated she was returning to her apartment to get ready for work.

Grissom also contends the jury should attach no importance to the fact that a curling iron, which was still turned on, was found in one of the bathrooms after Rusch and Brown disappeared. The jury could decide otherwise. The jury also could take into account that Rusch and Brown never showed up for work that Monday or thereafter; that on the evening of the day both women disappeared, Rusch was photographed looking grim and disheveled as she withdrew money from Brown's checking account with Brown's ATM card; that Brown, while accompanied by Grissom and looking distressed, signed a storage rental agreement using Rusch's name, if the jury believed the manager's testimony; and that both Rusch and Brown disappeared and were never seen again. The evidence established a pattern of behavior.

Grissom raises the same arguments concerning why there is no evidence showing he intended to commit a theft at the time he allegedly entered the apartment. Grissom's arguments were addressed in the previous issue and need not be repeated here.

Based upon the evidence presented at trial, a rational factfinder could find beyond a reasonable doubt that Grissom had committed the aggravated burglary of Rusch and Brown's apartment.

## VIII. AGGRAVATED KIDNAPPING OF RUSCH

The trial court instructed the jury that in order to convict Grissom of the aggravated kidnapping of Rusch, the State had to prove the following:

"1. That the defendant took or confined Christine A. Rusch by force, threat or deception;
2. That it was done with intent to hold such person to facilitate the commission of a crime;
3. That bodily harm was inflicted upon Christine A. Rusch; and
4. That this act occurred on or about the 26th day of June, 1989, in Johnson County, Kansas."

The amended complaint specifies that Grissom took Rusch to facilitate the crime of robbery.

The standard of review for sufficiency of the evidence set forth previously applies.

Grissom claims the evidence does not support that he took or confined Rusch because the State failed to link him with Rusch's disappearance. In support of this claim, the defendant incorporates the arguments he set forth in Issue I. For the reasons set forth in Issue I, we find his arguments unpersuasive.

Grissom contends the State failed to prove the alleged kidnapping was done to facilitate the commission of a robbery. The defendant incorporates his arguments set forth in Issue IV. For the reasons set forth in Issue IV, Grissom's argument fails.

In the alternative, Grissom maintains that even if this court finds sufficient evidence to support a kidnapping conviction, the evidence only supports a finding of kidnapping, not aggravated kidnapping. Aggravated kidnapping differs from kidnapping in that it requires the additional element of bodily harm inflicted upon the victim. Compare K.S.A. 21-3421 with K.S.A. 21-3420. Citing *State v. Lassley*, 218 Kan. 758, 761-62, 545 P.2d 383 (1976), and *State v. Racey*, 225 Kan. 404, 408-09, 590 P.2d 1064 (1979), the defendant argues that the aggravated kidnapping conviction is multiplicitous with the first-degree murder conviction because the State relied upon the same act of force for both convictions.

"Multiplicity exists if the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other. Charges are also not

multiplicitous if the offenses occur at different times and in different places." *State v. Scott*, 250 Kan. 350, Syl. ¶ 1, 827 P.2d 733 (1992).

See *State v. Woods*, 250 Kan. 109, 825 P.2d 514 (1992).

Aggravated kidnapping and first-degree murder each require proof of facts not required in proving the other. For example, unlike first-degree murder, aggravated kidnapping requires that the defendant took or confined Rusch by force, threat, or deception. The charges are not multiplicitous. See, *e.g., State v. Chears*, 231 Kan. 161, 163, 643 P.2d 154 (1982).

Based upon the evidence presented at trial, a rational factfinder could find beyond a reasonable doubt that Grissom had committed the aggravated kidnapping of Rusch.

## IX. SEIZURE OF EVIDENCE FROM VEHICLE

Grissom's 1981 brown Toyota Corolla was discovered in the parking lot of Stonybrook South Apartments in Grandview, Missouri, on June 27, 1989. There was a warrantless entry into the vehicle. The car then was towed and searched pursuant to a warrant.

The defendant filed a motion to suppress the evidence seized from the car. After a hearing, the trial court denied the defendant's motion. The trial court ruled that Grissom had no standing to challenge the search and subsequent seizure because he had abandoned his expectation of privacy in the Toyota. Grissom disagrees with the trial court's ruling and raises this issue on appeal.

"It has long been the law that individuals who abandon items of personal property will not be permitted to effectively contest the legality of the search and seizure of such abandoned items. Some cases speak in terms of individuals without standing to contest the search or seizure where they have relinquished ownership or possession of the property in question. Others have held that police retrieval of abandoned property is not a 'seizure' within the meaning of the Fourth Amendment, while a third line of cases turns on the question of whether, under the circumstances, individuals who have abandoned property can do so and maintain a 'reasonable expectation of privacy' of the property abandoned. See Annot., 40 A.L.R.4th 381; 68 Am. Jur.2d, Searches and Seizures § 9." *State v. Brunson*, 13 Kan. App. 2d 384, 389, 771 P.2d 938, *rev. denied* 245 Kan. 786 (1989).

In *California v. Greenwood*, 486 U.S. 35, 51, 100 L. Ed. 2d 30, 108 S. Ct. 1625 (1988), the United States Supreme Court framed the issue in terms of whether society accepts as reasonable

the individual's expectation of privacy in the searched or seized material. In *State v. Chiles*, 226 Kan. 140, 147, 595 P.2d 1130 (1979), this court stated that "[t]he test for abandonment is whether the complaining party retains a reasonable expectation of privacy in the premises." See *State v. Clemons*, 251 Kan. 473, 484, 836 P.2d 1147 (1992) ("One moving to suppress evidence has the burden of proving not only that the search was illegal, but also that he or she had a legitimate expectation of privacy in the place from which the property was seized.") "Abandonment raises questions of fact and intent of the person who allegedly abandoned the property. [Citation omitted.]" *Chiles*, 226 Kan. at 147. "[E]vents that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time. [Citation omitted.]" *United States v. Winchester*, 916 F.2d 601, 604 (11th Cir. 1990).

The Court of Appeals, in *State v. Brunson*, 13 Kan. App. 2d 384, recently considered the warrantless search of an abandoned automobile and the seizure of items therein. The defendant was sitting in his parked car on a public street in a subdivision in which several burglaries had occurred. When the defendant realized the police were observing him, he drove off. The police followed. The defendant drove the car onto a golf course, into some bushes or trees, and then took off on foot. When the police reached the defendant's vehicle, they found the car lights were on, the keys were in the ignition, and the gear selector was in drive, but the engine was turned off.

The Court of Appeals upheld the warrantless search of the defendant's vehicle and set forth the following principles:

"The warrantless search of an automobile which has been abandoned by its owner will violate the Fourth Amendment only if the defendant manifested a subjective expectation of privacy in the automobile and its contents that society accepts as objectively reasonable."

"One's personal right to Fourth Amendment protection of property against search and seizure is lost when that property is abandoned, absent a manifested reasonable expectation of privacy."

"[I]n determining the continued existence of Fourth Amendment property rights, whether the facts reveal a complete abandonment of an automobile in the strict property rights sense is not the issue. The issue is whether, by any good, sound, ordinary sense standard, the defendant abandoned any

reasonable expectation to a continuation of his personal right against having his car searched." 13 Kan. App. 2d 384, Syl. ¶¶ 3, 4, 5.

The District of Columbia Circuit Court of Appeals phrased the property versus privacy interests as follows: "The test for abandonment in the search and seizure context is distinct from the property law notion of abandonment: it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object." *U.S. v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989).

In upholding the warrantless search, the *Brunson* court reasoned that

"the defendant abandoned his automobile while attempting to evade the police, who were in hot pursuit. He knew, or should have known, that when the police reached his vehicle they would search it. He left his keys in the ignition and his doors unlocked. Under these circumstances, we do not believe society is prepared to accept an expectation of privacy in such vehicle as objectively reasonable." 13 Kan. App. 2d at 394-95.

Other jurisdictions have addressed this issue. If a suspect parks his car and flees on foot to avoid being questioned or apprehended by the police, some jurisdictions have held that the suspect's expectation of privacy in the vehicle is not objectively reasonable. One court placed emphasis on the fact that the suspect made no effort to assert a possessory interest, even after realizing the police had impounded the car. See, *e.g.*, *State v. Asbury*, 124 Ariz. 170, 602 P.2d 828 (1979); *Thom v. State*, 248 Ark. 180, 450 S.W.2d 550 (1970); *Hunt v. Commonwealth*, 488 S.W.2d 692 (Ky. 1972). If the police do not objectively identify the suspect's vehicle during the chase, they cannot claim abandonment if they later locate a parked car of similar description. Furthermore, if officers do not follow departmental procedures on handling abandoned vehicles, this is indicative that the officers themselves did not consider the vehicle abandoned. *United States v. Abbott*, 584 F. Supp. 442, 452 (W.D. Pa.), *aff'd* 749 F.2d 28 (1984).

In *State v. Asbury*, 124 Ariz. 170, an officer, after hearing a radio communication describing a robbery suspect and his vehicle, spotted the vehicle and gave chase. The suspect parked the car and fled on foot. After establishing that the vehicle did not belong where it was parked, the officer searched it. An Arizona appellate

court concluded that the car had been abandoned and upheld the warrantless search.

In *Hunt v. Commonwealth*, 488 S.W.2d 692, the police were investigating the robbery of a post office. The suspicious activities of three men and a description of their two cars had been reported. An officer saw a car, which matched the description of one of the cars in the report, parked at a roadside park with three men standing beside it. The officer pulled into the park, and the three men ran into the woods. The officer apprehended two of the men, who both claimed they had been hitchhiking and did not know the driver (Hunt). The car was kept under police surveillance for about four hours. Hunt never returned to the car nor asserted any possessory interest in it after the police impounded it. The highest court in Kentucky agreed that the car had been abandoned and upheld the warrantless search.

In *Thom v. State*, 248 Ark. 180, a city marshal saw a white car parked at a service station at about 4 a.m. The marshal then observed the defendant tampering with a cigarette machine inside the station. When the defendant saw the marshal, he fled. The Arkansas Supreme Court concluded that the defendant had abandoned the car, and the court upheld the warrantless search. The court reasoned:

"Sometimes an automobile takes on the characteristics of a man's castle. Other times an automobile takes on the characteristics of an overcoat—that is, it is movable and can be discarded by the possessor at will. If [the defendant] in his endeavors to avoid the clutches of the law had discarded his overcoat to make his flight more speedy, no one would think that an officer was unreasonably invading his privacy or security in picking up the overcoat and searching it thoroughly. In that situation most people would agree that the fleeing suspect had abandoned his coat as a matter of expediency as well as any rights relative to its search and seizure. What difference can there be when a fleeing burglar abandons his automobile to escape the clutches of the law?" 248 Ark. at 182.

Did Grissom manifest a subjective expectation of privacy in his Toyota that society accepts as objectively reasonable? Grissom maintains it "is patently unreasonable to believe that a person intends to abandon an expectation of privacy in a locked, properly parked vehicle which is full of his personal property."

Those were not the only facts upon which the trial court based its findings. The trial court specifically noted the following: Gris-

som was parked on private property without authorization. He fled the apartment complex because of the arrival of the police. He slept in a field across the street from the complex. The defendant was aware his car was in the parking lot when the police arrived and when his car was towed. He did not attempt to identify himself or assert his right to privacy in the car. He did not inquire where the car was being towed or go to the police station to claim the car. Although Grissom remained in the immediate vicinity, he consciously avoided any contact with the car. The next morning, the defendant stole a different car and drove to Texas. The only evidence in Grissom's favor, according to the trial court, was the stipulation that the Toyota, "bearing stolen plates and a bogus VIN, belonged to him at the time he drove it to the apartment complex on the night in question."

Grissom contends the trial court's finding that he did not return to his vehicle because he was aware he was under suspicion is erroneous because he was "not required to incriminate himself to preserve his Fourth Amendment rights." In support of this contention, Grissom cites 4 LaFave, Search and Seizure § 11.3(e), p. 333 (2d ed. 1987) (citing *Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 [1968]). LaFave stated that

"[a]bandonment is different than a disclaimer of ownership made to the police prior to the search, which should not (but sometimes is held to) defeat standing. . . . *Given the fact that one does not otherwise have to incriminate himself to preserve his Fourth Amendment rights*, it is difficult to understand how a refusal to make incriminating admissions in response to police interrogation can be held to deprive a person of Fourth Amendment standing." (Emphasis added.) 4 LaFave, Search and Seizure § 11.3(e), at 333.

The italicized portion of the quote is the part to which the defendant refers.

Grissom could have testified at the suppression hearing in an attempt to establish standing without damaging his trial defense, but chose not to do so. See *Simmons v. United States*, 390 U.S. 377, 393-94, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968) (If a defendant testifies in an attempt to establish standing, that testimony cannot be used against him at trial to establish guilt.);

*State v. Cruz*, 15 Kan. App. 2d 476, 484, 809 P.2d 1233 (1991) (same).

"If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court."

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *State v. Garcia*, 250 Kan. 310, Syl. ¶¶ 2, 3, 827 P.2d 727 (1992).

The record supports the trial court's findings. Under these circumstances, Grissom's expectation of privacy in his Toyota was not objectively reasonable.

Grissom also argues that information omitted from the affidavit necessitates the suppression of evidence seized pursuant to the warrant. The affidavit omitted mention of the Grandview officer's warrantless entry into the Toyota and the discovery of credit cards belonging to Christine Rusch and Theresa Brown.

In *State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433 (1982), this court, relying upon *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), reviewed the general rules applying to a false statement in an affidavit for a search warrant and extended the rules to a deliberate omission. This court stated that a person attacking the affidavit must show the deliberate omission of material information. 232 Kan. at 319.

Here, in determining whether the omission was deliberate, the trial court noted the following:

"The facts are clear that a Grandview police officer directed a private citizen, the tow truck operator, to invade the locked door of the Toyota by use of a 'slim jim' device commonly used by tow truck operators to open locked vehicles. The officer had been called to the private parking lot of an apartment complex by the manager. He was told that the Toyota auto in question did not belong to any resident and was believed to belong to a person wanted in connection with a disappearance in Johnson County, Kansas. In plain view he observed a credit or bank card on the floorboard of the Toyota. The owner or possessor of the vehicle was not present. He testified he directed the door to be opened in an effort to determine ownership. The actions of this investigating officer are not those the Court would recommend. Appropriately he should have done nothing more than make

his 'plain view' observations, impound the vehicle known to have a stolen license plate and a VIN not applicable to the Toyota. . . .

.  .  .  .

". . . The officer upon entering the vehicle looked at the credit or bank card for the express purpose of determining ownership of the automobile. The officer so testified and there is no evidence to the contrary. The vehicle was parked on private property without the authority of the property owners. The apartment manager was requesting that the police authorities tow or remove the vehicle from the premises. The vehicle was full of personal belongings but none were searched nor disturbed by the officer who made the entry without a warrant. He did not enter the glove compartment nor the trunk. He attached no significance to the name or names on the cards. He did not think this information to be of enough importance to mention it to the officer who later prepared the Affidavit for Search Warrant. Any information obtained by entering the vehicle was not contained in the affidavit nor made known to Judge Aylward who issued the warrant."

The officer who prepared the affidavit for the search warrant was not involved in the investigation of the case. The Grandview officer mentioned above supplied an Overland Park officer with information pertaining to the discovery of the Toyota. The Overland Park officer, who was involved in the investigation of Butler's disappearance and had interviewed Thibodo, supplied the information to the affiant.

The trial court found that the officer's actions in opening the car door, although not recommended, were not a "subterfuge to obtain the basis for a search warrant." The trial court was satisfied the information was omitted only because the officer had not realized the significance of the names on the credit cards. The trial court concluded that Judge Aylward was not misled because the affidavit omitted the officer's observation of the credit cards.

Grissom contends the omission was deliberate, based upon conflicting testimony concerning the officers' knowledge of the names on the credit cards and of the significance of those names. The defendant questions the credibility of one of the officers.

It is not the function of this court to determine the credibility of witnesses. There is substantial evidence to uphold the trial court's finding that the omission was not deliberate.

The *Lockett* court defined material as "if the issuing judge had the omitted information before him when he examined the affidavit, would a finding of probable cause to issue a search warrant still have been proper?" 232 Kan. at 320. As the State points

out, the omitted information would have strengthened the probable cause showing, not weakened it.

The trial court did not err in holding that the omission was neither deliberate nor material.

The trial court also commented that the Grandview officer's actions would fit within the good faith exception to the exclusionary rule, adopted in *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405, *reh. denied* 468 U.S. 1250 (1984). For a recent Kansas discussion of the good faith exception, see *State v. Probst*, 247 Kan. 196, 203-05, 795 P.2d 393 (1990). The trial court concluded that the officer's actions did not justify suppression of the evidence. We agree.

Grissom's final argument concerning the validity of the search warrant was that the warrant was executed illegally by Kansas police officers. The defendant maintains that the actual search did not comply with the terms of the warrant because Johnson County detectives removed the items from the vehicle. The warrant was directed to "any peace officer in the State of Missouri."

The trial court found that the search warrant had been executed properly because Johnson County detectives had searched the Toyota in the presence of a Missouri officer; Johnson County detectives had acted as agents of the Missouri officer; and the Missouri officer had signed the return of the warrant. The trial court rejected the defendant's argument that the Kansas officers were acting as private citizens. The trial court's findings are persuasive.

The trial court did not err in denying Grissom's motion to suppress evidence seized from his Toyota.

Grissom also contends that the affidavit in support of the search warrant did not establish probable cause to search Grissom's car for evidence relating to Joan Butler's disappearance. According to Grissom, the search warrant authorized the search of Grissom's Toyota for "[i]tems of evidence pertaining to the abduction of Joan Marie Butler—specifically hair, blood, fibers and trace evidence, and related articles. Keys, personal effects, clothing."

Whether probable cause existed to issue a search warrant is determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 103 S. Ct. 2317, *reh.*

*denied* 463 U.S. 1237 (1983); see *State v. Probst*, 247 Kan. at 200-02.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." 462 U.S. at 238-39.

"Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. It does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt. [Citations omitted.] Probable cause has been described as ' "[b]its and pieces of information . . . fitted together until a picture is formed which leads a reasonably prudent person to believe a crime has been . . . committed and that evidence of the crime may be found on a particular person or in a place or means of conveyance." ' [Citations omitted.]" *State v. Mayberry*, 248 Kan. 369, 377-78, 807 P.2d 86 (1991).

The State and Grissom summarize the information contained in the affidavit as follows:

"Joan Butler was reported missing on June 19, 1989. Six days later, defendant was observed in possession of her vehicle in Lawrence, Kansas, where he was seen unlocking the car trunk. He then fled from the police, [and] returned to Lenexa, where he moved all of his personal belongings from his apartment to the Toyota. At the apartment complex in Grandview the apartment manager observed a light-skinned black male matching the description of Richard Grissom, whom she knew was wanted in Kansas for an abduction. A brown Toyota Corolla was parked in the complex lot and it did not belong there."

The magistrate judge did not err in issuing the search warrant. There was a "fair probability" evidence would be found in Grissom's car relating to the disappearance of Joan Butler, particularly since Grissom recently had moved many of his personal belongings to his car.

### X. SEARCH OF STORAGE SPACE AND GRISSOM'S APARTMENT

Grissom filed pretrial motions to suppress evidence seized from both the rented locker at South Metcalf Mini Storage and the apartment in Lenexa where he had resided. The trial court denied

both motions, finding that Grissom had abandoned the properties. Because Grissom lacked standing, the trial court never addressed the merits of the defendant's Fourth Amendment claims.

The law pertaining to abandonment of property subject to a warrantless search and seizure was set forth in the previous issue and will not be repeated. Here, the property at issue is rental property. This court has considered standing to challenge the search of allegedly abandoned rental property in the context of a hotel room. "Generally, when the search of the room occurs *during* the rental period, the appellant has standing to object to an unauthorized search of the premises, unless prior to the search he has abandoned the premises, and thereby forfeited his right to occupancy and privacy." *State v. Chiles*, 226 Kan. at 147.

The police entered the storage locker without a warrant on June 30, 1989.

At the suppression hearing, Grissom presented two witnesses: Marcelais Thibodo and Terry Barnes, a Grandview detective. Thibodo testified to the following: Although he did not see Grissom sign the lease, he knew Grissom had rented the locker at South Metcalf Mini Storage. Thibodo had used the locker along with Grissom in connection with the painting business. On June 25, 1989, Grissom gave Thibodo complete custody and control of the painting business and of the contents of Grissom's apartment. Grissom told Thibodo he was going to California. On June 28, when Thibodo went to the storage locker, he found that the lock securing the locker had been removed. Barnes testified that Thibodo said Grissom wanted $5,000 for the painting business and the contents of his apartment. Barnes also testified that Thibodo said Grissom had given Thibodo keys and blank business checks before Grissom took off. Thibodo denied that Grissom wanted $5,000 for the business and the contents of his apartment. Thibodo never paid Grissom any money.

Grissom asserts that the trial court erred in not finding that Grissom offered to sell the business and the contents of his apartment for $5,000. The defendant claims the sale was conditional and the condition, payment of $5,000, was never met. Therefore, according to Grissom, he never abandoned his interest in the business and, as a result, retained his expectation of privacy in the locker. Grissom's underlying argument is that the trial court

erred in believing Thibodo's testimony. As previously stated, it is not this court's function to decide which witness is more credible.

In denying Grissom's motion to suppress evidence seized from the storage locker, the trial court stated:

"[T]he Court can only take what it has before it in the nature of testimony. The testimony here certainly does not meet the affirmative requirement of standing and again rather questionable as to whether testimony is sufficient to even establish that Mr. Grissom leased this locker to begin with. . . . [B]ut if it was leased, the testimony is rather clear that on June the 30th, that there had been abandonment and Mr. Grissom had no reasonable expectation of privacy."

There is substantial evidence in the form of Thibodo's testimony to uphold the trial court's finding that Grissom had abandoned the storage locker prior to the warrantless search on June 30, 1989. See *State v. Garcia*, 250 Kan. 310, Syl. ¶ 2, 827 P.2d 727 (1992).

The police entered Grissom's apartment without benefit of a warrant on June 27, 1989. With regard to the hearing on the motion to suppress evidence seized from the apartment, Thibodo and Terry Morgan, an Overland Park detective, were the only two witnesses.

Thibodo testified to the following: Grissom had resided at an apartment at Chesapeake Estates in Lenexa. On June 25, 1989, with Thibodo's help, Grissom loaded most of his personal belongings into the Toyota. Grissom told Thibodo he had taken what he wanted and Thibodo could have the remaining contents of the apartment. Among the things Grissom had said he wanted were the CDs. Thibodo thought Grissom had taken all the CDs with him, but was not sure. Grissom also gave Thibodo keys and checks relating to the business. Grissom had lost the key to the apartment during his confrontation with the Lawrence police, but said he would leave the apartment's sliding door open so Thibodo could come into the apartment and take what he wanted. Thibodo believed Grissom had moved out of the apartment.

Morgan testified to the following: On June 30, 1989, he had provided information for an affidavit for a search warrant. Thibodo had supplied the information that identified a specific apartment as Grissom's primary residence. Grissom's name was not on the

apartment lease. Morgan did not find anything in the apartment that he could attribute to someone other than Grissom. Morgan believed that the only thing that tied Grissom to the apartment was that some of the property in the apartment either belonged to Grissom or formerly belonged to him. Morgan acknowledged that Thibodo had said Grissom had given him the contents of the apartment. The affidavit was admitted into evidence to show what the police believed concerning whose apartment it was.

Grissom argues that although his name was not on the apartment lease, it is undisputed that he kept his possessions and resided at the apartment. The State does not contest that prior to the alleged abandonment, Grissom had a legitimate expectation of privacy in the apartment.

The defendant next contends that he never abandoned his interest in the apartment because Thibodo never paid the $5,000 to complete the conditional sale. As previously discussed, the trial court, supported by substantial evidence, rejected this view of the evidence.

Grissom's second contention is based upon the fact that he said Thibodo could have the *contents* of the apartment. The defendant claims he never abandoned his expectation of privacy in the apartment because he never relinquished his interest in the apartment itself. He cites no authority to support this novel interpretation of abandonment.

Other jurisdictions have found abandonment based on similar facts. See *United States v. DeParias*, 805 F.2d 1447 (11th Cir. 1986) (defendant told roommate he was leaving town and not returning), *cert. denied* 482 U.S. 916 (1987); *United States v. Sledge*, 650 F.2d 1075 (9th Cir. 1981) (defendants gave landlord notice of intent to vacate the apartment by March 31; rent was paid through March 31; apartment was considered abandoned before the end of the month because all furnishings belonging to the defendants were gone, most of the clothes were gone, and there was no food in the apartment); *United States v. Wilson*, 472 F.2d 901 (9th Cir. 1972) (defendant moved out owing two weeks' rent, and it was not certain if he would return; apartment was considered abandoned even though clothes and a television set belonging to defendant remained in the apartment), *cert. denied* 414 U.S. 868 (1973); *United States v. Jordan*, 399 F.2d

610 (2d Cir.) (defendant in process of moving to new apartment; rear door found unlocked; no personal effects found in old apartment), *cert. denied* 393 U.S. 1005 (1968); *Parman v. United States*, 399 F.2d 559 (D.C. Cir.) (defendant fled area immediately after crime and was registered at a tourist home in another state under an assumed name when search occurred; defendant subsequently sought a job, bought clothes and furniture, and rented another apartment in yet another state under a different assumed name), *cert. denied* 393 U.S. 858 (1968); *Feguer v. United States*, 302 F.2d 214 (8th Cir.) (defendant moved out before end of rental period; abandonment occurs at the time defendant moved out, not when rental period ends), *cert. denied* 371 U.S. 872 (1962).

The record supports the trial court's finding that Grissom abandoned the apartment on June 25, 1989, and thus relinquished his reasonable expectation of privacy in the premises.

The trial court did not err in denying the defendant's motions to suppress evidence seized from the storage locker and the apartment.

## XI. GRISSOM'S STATEMENT

Grissom was arrested on July 7, 1989, at the Dallas-Fort Worth airport by FBI Agent Michael Napier. Shortly after the arrest, Napier questioned the defendant.

Prior to trial, Grissom filed a motion to suppress the statement he made in Texas, which was denied. The defendant renewed his objection during trial prior to Napier's testimony.

Grissom raises the same three arguments on appeal that he raised at trial. He first argues that Texas law should govern the admissibility of his statement because the statement was obtained in Texas. The defendant disagrees with the trial court's ruling that the Texas statute was procedural, a rule of evidence and, therefore, not applicable to Kansas proceedings.

The Texas Code of Criminal Procedure specifies that

"[n]o oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless . . . an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement." Tex. Code Crim. Proc. Ann. 38.22(3)(a)(1) (Vernon 1992 Supp.)

Under Texas law, Grissom's statement would be inadmissible in a Texas state court because no electronic recording was made of the statement. In support of his argument, the defendant cites *State v. Blood*, 190 Kan. 812, 378 P.2d 548 (1963), suggesting the rule in that case be applied to the Fifth Amendment argument.

In *Blood*, a Missouri trooper received a dispatch about a watch stolen in Missouri and a description of the suspect's vehicle. One of the vehicle's occupants was wearing the stolen watch. The occupants were arrested and the vehicle searched. During the search, the trooper found items subsequently determined to have been taken during a burglary occurring in Kansas. Blood was tried and convicted of the burglary in Kansas. On appeal, Blood alleged error in the Missouri search. This court looked to Missouri law to determine the legality of the search because the search and seizure occurred in Missouri. 190 Kan. at 816.

In response, the State points out that the instant facts differ significantly from *Blood* and that *Blood* was decided before the enactment of the current Kansas Code of Criminal Procedure. K.S.A. 22-2102 specifies that "[t]he provisions of this code shall govern proceedings in all criminal cases in the courts of the state of Kansas." The same basic provision, however, was in effect prior to the *Blood* decision. See, *e.g.*, G.S. 1949, 62-1801. More persuasive is the State's contention that Texas law concerning the admissibility of an accused's statement is procedural and that according to K.S.A. 22-2102, Kansas procedure governs. Kansas does not require an accused's statement to be electronically recorded.

No Kansas case directly on point has been cited or found. Until recently, application of conflict-of-laws considerations in a criminal proceeding has been a rare occurrence in any jurisdiction. See generally Corr, *Criminal Procedure and the Conflict of Laws*, 73 Geo. L.J. 1217 (1985). The State does point our attention to *State v. White*, 246 Kan. 28, 785 P.2d 950 *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990), in which this court addressed whether two statements made by the defendant were admissible in Kansas. One statement was made in Arizona to Arizona police officers, and the second statement was made in Arizona to Kansas police

officers. No conflict-of-laws issue was raised, and none was addressed. This court upheld admission of the statements on the basis of Kansas law.

The State also directs our attention to *People v. Benson*, 88 App. Div. 2d 229, 454 N.Y.S.2d 155 (1982), a case addressing the exact issue before us. In *Benson*, the defendant was convicted of manslaughter in New York for a crime committed in New York. On appeal, he alleged that the confession he made to New York police officers in Texas was inadmissible because the New York officers had not informed him of his right to terminate the interview at any time and had not electronically recorded his statement, both required by Texas law. The issue before the appellate court was whether the Texas statute applied to the New York proceeding.

The appellate court upheld the trial court's decision to apply New York law, but disagreed with the trial court's characterization of the issue as procedural. The appellate court stated:

"In our view, it is unnecessary to characterize the issue as either substantive or procedural since New York law should be applied in either event. Traditionally, procedural and evidentiary issues are governed by the law of the forum (see, generally, Restatement, Conflict of Laws 2d, §§ 122, 138). It is well established that 'the *Miranda* rule evolved solely as a procedural safeguard to protect the accused's privilege against compulsory self incrimination . . . .' [Citations omitted.] It has been held that admissibility of confessions presents a matter of State procedure [citation omitted]. Beyond a strictly procedural approach, however, it is clear that this State's law governs since New York has a paramount interest in the application of its laws to this case [citation omitted]. The essential policy behind the exclusionary rule is to deter unlawful police activity, 'not redress "a personal constitutional right of the party aggrieved" ' [citation omitted]. Here, New York police officers obtained a statement for use in a New York proceeding emanating from a violent crime in New York. Application of the exclusionary rule would not serve any useful purpose since Texas authorities were not involved. Indeed, exclusion of the subject statement would serve to undermine the good faith efforts of the New York police in complying with the *Miranda* standards." 88 App. Div. 2d at 231.

See *State v. Curry*, 109 N.J. 1, 532 A.2d 721 (1987), and cases cited therein.

The reasoning in *Benson* is persuasive and Kansas law governs.

Yet another reason exists to admit the statement. A federal charge had been filed against Grissom, and the FBI agent arrested

Grissom based on the federal charge. The statement would have been admissible in a federal court and not subject to Texas state law concerning the taking of statements. We do not address that argument further because it is not raised by the parties.

Grissom's second argument is that he was not advised of his *Miranda* rights prior to questioning. In support of his argument, he cites to the conflicting testimony presented at the suppression hearing. He claims that the trial court erred in finding that he was advised of his rights before making his statement and, therefore, erred in failing to suppress his statement.

As previously set forth, "[i]f the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court." *State v. Garcia*, 250 Kan. 310, Syl. ¶ 2, 827 P.2d 727 (1992).

Agent Napier testified to the following: He arrested Grissom on July 7, 1989, shortly before 10 a.m. Using the FBI's standard *Miranda* rights and waiver form, Napier advised Grissom of his rights and asked if he understood his rights. Napier then explained waiver of rights and asked Grissom if he was willing to be interviewed about the disappearances of the three Johnson County women. Grissom agreed to be interviewed. The process started at 9:57 a.m. and ended at 9:59 a.m. Napier then asked another officer, Kevin Mabry, to witness the reading of Grissom's *Miranda* rights and Grissom's waiver of those rights. Napier went through the process again for Mabry's benefit. Grissom again agreed to talk with Napier. Napier did not ask Grissom to sign the waiver form because he was handcuffed at the time. The form was admitted into evidence.

Mabry testified to the following: Napier asked Mabry to witness the reading of Grissom's *Miranda* rights. After each statement, Napier stopped and asked Grissom if he understood before proceeding. After reading the *Miranda* rights, Napier again asked Grissom if he understood everything, and Grissom nodded affirmatively. Napier then asked Grissom to sign a verbal consent form. Grissom said he would not sign the form, but he would answer questions. At that point, Napier signed the form and Mabry signed as a witness. Mabry confirmed that Grissom was handcuffed during this process.

The defendant presented the testimony of Paul Shunatona, a Texas attorney appointed to represent Grissom after Grissom requested that an attorney convey an "offer" on his behalf to the Johnson County District Attorney. Shunatona talked with Agent Napier and other officers on July 8, 1989, at approximately 1 a.m. Shunatona testified that he asked Napier if Grissom's statements were made before the *Miranda* rights were read and that Napier said Grissom's statements were made prior to being read his rights. Shunatona acknowledged that he did not have an independent recollection of the talk, that he was relying upon some notations he had made during the conversation, and that he would not have remembered the incident if his notes had not refreshed his memory.

Napier testified that he told Shunatona that Grissom had been advised of his *Miranda* rights prior to making a statement.

Thomas Robinson, a Kansas City, Missouri, police officer, was present during the conversation between Napier and Shunatona. Robinson testified Napier never told Shunatona that Napier had not read Grissom his *Miranda* rights prior to taking Grissom's statement.

Based upon the above evidence, the trial court ruled that Grissom had been read his *Miranda* rights prior to making a statement. The trial court specifically noted that Shunatona's notations were ambiguous and subject to several different interpretations. The trial court's ruling is supported by substantial evidence, and we find no error.

Grissom's final argument in support of his claim that his statement should be suppressed is that he did not make his statement voluntarily. Although Grissom's statement was not a confession in that he did not admit to injuring or killing the three women, he did make statements against his interest. Thus, the factors to determine the voluntariness of a confession are applicable here.

"The voluntariness of a confession is to be viewed in light of the totality of circumstances, including the following factors: (1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect, and background; and (4) the fairness of the officers in conducting the interrogation. The essential determination is whether the statement was the product of the accused's free and independent will. If the accused was not deprived of his free choice to admit, deny, or refuse to answer, the statement may be considered

voluntary. The State has the burden of proving the statement was given voluntarily." *State v. Nguyen*, 251 Kan. 69, Syl. ¶ 2, 833 P.2d 937 (1992).

"If a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by the accused, determines the statement was given freely, voluntarily, and knowingly, and admits the statement into evidence at the trial, the appellate court will accept that determination if it is supported by substantial competent evidence." *State v. Zimmerman*, 251 Kan. 54, Syl. ¶ 9, 833 P.2d 925 (1992).

The trial court expressly stated it reviewed all of the evidence and considered the above voluntariness factors. The court found no evidence that Grissom's will was overborne at any time during the interview. The trial court also took "judicial notice of its own files and records," which indicated that Grissom had been arrested on criminal charges on at least 10 prior occasions and that Grissom had been incarcerated within this state.

Napier testified at the suppression hearing concerning the duration and manner of the interrogation. Napier said the interview started at approximately 10:30 a.m. and continued until 6:00 p.m. It was conducted in a nonjail setting, a supervisor's office at the main Dallas-Fort Worth International Airport Public Safety Station. Napier estimated the office, which contained a desk, a couch, and some chairs, to be 12 by 12 feet. Napier was present during the entire interrogation. After the first 45 minutes or so, a Leawood detective also was present.

Grissom was handcuffed during the entire interrogation. Initially, he was handcuffed with his hands behind his back. After the Leawood detective joined the interrogation, the defendant was rehandcuffed with his hands in front. Napier said he kept Grissom in handcuffs because, in addition to being a suspect in the disappearances and murders of the three Johnson County women, the defendant had a prior escape and homicide conviction and had fled from Lawrence police during this investigation. Additionally, Napier knew Grissom was physically fit and practiced martial arts.

Napier said he conducted a very low-key interview: He did not yell, threaten, or attempt to physically intimidate the defendant. Napier testified there were several breaks at the defendant's request, including visits to the restroom. Grissom also was provided with beverages and two meals. Napier stated that Grissom was not deprived of anything he requested. According to Napier,

Grissom was calm, alert, and, when he wanted something, assertive. Napier said the defendant actively participated in the interview. Sometimes Grissom would volunteer information; other times he would challenge the officers, such as objecting to questions or denying his involvement.

The Leawood detective's testimony corroborated Napier's recounting of the interrogation.

Grissom's complaints concerning the duration and manner of the interrogation are that he was handcuffed the entire time and that the interview lasted eight hours. Ample security reasons existed for Grissom to remain in handcuffs during the entire interview. The interrogation was not a continuous eight hours because of meal and restroom breaks. There is no evidence that Grissom requested the interview be terminated. The interview was terminated by Napier when Grissom requested that an offer be conveyed to the Johnson County District Attorney. We cannot say that, under the totality of these circumstances, this approximately eight-hour interrogation is on its face coercive. See *State v. William*, 248 Kan. 389, 409-11, 807 P.2d 1292 (1991) (voluntariness of defendant's statement upheld under circumstances in which defendant had been interrogated for approximately 6 hours, although not continuously, and with police for a total of 19 hours).

Grissom does not allege he was denied access to the outside world. He made no request to communicate with the outside world until he requested that an offer be conveyed to the district attorney in Johnson County. His request was honored and, at that point, the interrogation ceased.

Grissom was 28 years old at the time of the interview. The trial court noted the defendant's familiarity with the criminal system, in that he had been arrested on at least 10 prior occasions and had served time in Kansas. The State points to Grissom's request to have an "offer" conveyed as evidence of his sophistication in dealing with the criminal justice system. Grissom's demeanor during the interrogation was described as alert, assertive, calm, and controlled. He occasionally tried to take control of the interview to see what information he could get from the officers. He was not under the influence of alcohol or drugs during the interview.

The defendant takes greatest exception to the fairness of the officers in conducting the interrogation. He claims it was inaccurately represented to him that he would be prosecuted for the homicides and not the property-related offenses. Grissom was tried and convicted of both types of offenses. For support, the defendant cites to the following in the record: Napier's statement that "[e]arly in the interview we talked about . . . negotiating for what he would tell us." Napier also told Grissom "that based upon comments or conversation with [the district attorney], that if we were talking death, homicides, these three girls, . . . that is what he would be prosecuted for, not for any of the property crimes."

The State responds that Grissom is taking these statements out of context. Napier testified that the defendant brought up the subject of a deal with the prosecutor and that they

"were talking to him about things that he had that would be favorable to him, bargaining chips, . . . leading us to the location of the bodies, telling him that there were things that he could do that would be helpful to him and that is when he said, 'What is in it for me,' and from there we moved into, 'What are you offering so that we can get a response for you?' "

The suppression hearing testimony indicates the negotiations between Grissom and the State never reached a level of promises being made. Even if a promise had been made to Grissom, it was conditioned upon Grissom disclosing the location of the bodies and his involvement in the crimes, which Grissom did not do. The evidence does not support the defendant's allegations that he was treated unfairly by the police.

The trial court's finding that Grissom's statement was given freely and voluntarily is supported by substantial competent evidence.

### XII. K.S.A. 60-455 EVIDENCE

Prior to trial, the trial court conducted a hearing on the State's motion to admit, pursuant to K.S.A. 60-455, evidence of the attack upon Michelle Katf. "K.S.A. 60-455 does not require that the defendant be convicted of the crime or civil wrong at issue." *State v. Hall*, 246 Kan. 728, 739, 793 P.2d 737 (1990). The trial court granted the motion, stating that the evidence was admissible under K.S.A. 60-455 to prove plan, opportunity, preparation, or

identity. The court also stated the evidence was admissible independent of K.S.A. 60-455 as part of the res gestae of the case. The jury was instructed it could consider evidence of the attack upon Katf "solely for the purpose of proving the defendant's preparation, opportunity, plan or identity."

The pertinent statutory and case law provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 60-455.

"In ruling upon the admissibility of evidence of a prior crime or civil wrong under K.S.A. 60-455, the trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine the fact is a disputed, material fact; and (3) balance the probative value of the prior crime or civil wrong evidence against its tendency to prejudice the jury." *State v. Jordan*, 250 Kan. 180, Syl. ¶ 7, 825 P.2d 157 (1992).

Grissom acknowledges the relevancy of the evidence to prove identity. He, however, contests the trial court's finding that the evidence was relevant to prove plan, opportunity, and preparation.

The trial court found that the evidence of the attack upon Katf was relevant to prove preparation, opportunity, and plan and that the evidence supporting the relevancy of preparation, opportunity, and plan overlapped. The trial court determined the events were closely related in time: The attack upon Katf occurred on June 12. About a week later, on June 18, the alleged murder of Butler occurred. About two weeks later, on June 26, the alleged abduction and murder of Rusch and the alleged murder of Brown occurred. The court noted that all four women had resided in apartment complexes and that Grissom, who was a painting contractor, had done prior work at Katf's complex and at Rusch and Brown's complex. Of particular significance to the trial court was that there was no sign of forced entry at Katf's apartment, at Butler's apartment, and at Rusch and Brown's apartment and that Grissom possessed keys to all three apartments. The trial court also noted that Grissom had purchased a pellet pistol and am-

munition prior to the attack upon Katf and, thus, prior to the attacks upon Butler, Rusch, and Brown. The trial court concluded that this evidence had "relevance to prove the defendant's opportunity to commit these offenses and his preparation and plan to commit them." Furthermore, the trial court found that plan, opportunity, and preparation were disputed material facts. The court also found that the probative value of the evidence outweighed its prejudicial effect.

With regard to plan, the defendant claims the Katf evidence was not relevant because there is "no causal link" between the attack upon Katf and the crimes with which he was charged, because there is no evidence of a preexisting scheme connecting Katf with the victims in this case, and because the incident involving Katf is "distinct and unrelated" to the crimes in this case. To support his claim, Grissom cites *State v. Jones*, 247 Kan. 537, 544-46, 802 P.2d 533 (1990). The State argues the evidence related to the defendant's "modus operandi or general method used . . . to perpetrate similar but unrelated crimes." In support of its argument, the State cites *State v. Damewood*, 245 Kan. 676, 783 P.2d 1249 (1989), and *State v. Hall*, 246 Kan. at 739.

The *Jones* court stated:

"The plan exception of K.S.A. 60-455 is 'limited to evidence which shows some causal connection between two offenses, so that proof of the prior offense could be said to evidence a preexisting design, plan or scheme directed toward the doing of the offense charged.' [Citation omitted.] . . .

". . . In the Comment to the PIK instruction on this issue, it is stated:

'Plan refers to an antecedent mental condition that points to the doing of the offense or offenses planned. The purpose in showing a common scheme or plan is to establish, circumstantially, the commission of the act charged and the intent with which it was committed. Strictly speaking, *the exception is limited to evidence which shows some causal connection between the two offenses*, so that proof of the prior offense could be said to evidence a preexisting design, plan, or scheme directed toward the doing of the offense charged. Something more than the doing of similar acts is required to have probative value in showing plan, because the object is not merely to negate an innocent intent or show identical offenses, but to prove the existence of a definite project directed toward the doing of the offense charged.' [Citations omitted.]" 247 Kan. at 545-46.

In *Damewood*, however, this court stated:

"Admission of evidence under 60-455 to show plan has been upheld under at least two theories. In one the evidence, though unrelated to the crimes charged, is admitted to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes.

. . . .

"The rationale for admitting evidence of prior unrelated acts to show plan under K.S.A. 60-455 is that the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts. In such cases the evidence is admissible to show the plan or method of operation and conduct utilized by the defendant to accomplish the crimes or acts. [Citation omitted.]

"Another line of cases has held evidence of prior crimes or acts is admissible to show plan where there is some direct or causal connection between the prior conduct and the crimes charged. [Citations omitted.]" 245 Kan. at 681-83.

In *Jones*, this court held that evidence of the defendant previously breaking windows in his girlfriend's house was not admissible to establish plan. The defendant was charged with criminal damage to property for breaking windows in his girlfriend's car. 247 Kan. at 543-46. The *Damewood* court upheld admissibility of a sexual attack upon a prior victim because it "was strikingly similar to the method and plan" used by the defendant in the instant charge, including use of certain statements and language as well as specific actions. 245 Kan. at 682-83. In *Hall*, this court upheld the admissibility of evidence that the defendant previously had considered killing a truck driver so he could take the driver's new truck back to Oregon. The defendant was charged with the first-degree murder of a different truck driver. 246 Kan. at 739-40.

Under *Damewood*, the admissibility of the attack upon Katf falls easily within the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes. In addition, here, the trial court found that the crimes were not unrelated and that the evidence is admissible under *Jones*. The record contains evidence that the crimes are connected, at least causally, in that, starting with Katf, the defendant had a preexisting scheme to attack, abduct, rob, and/or kill women about once a week. Contrary to Grissom's assertions, the trial court's finding that the crimes are not distinct and unrelated is supported by the evidence.

"A ruling on the admissibility of prior crimes evidence lies within the sound discretion of the trial court and 'will not be interfered with on review unless that discretion was abused, or unless the trial judge admitted evidence that clearly had no bearing on any of the issues.' [Citation omitted.]" *State v. Mason*, 250 Kan. 393, 405, 827 P.2d 748 (1992).

The trial court did not abuse its discretion in admitting the Katf evidence to show plan.

With regard to preparation, Grissom claims the evidence was inadmissible because there was no basis for inferring that his alleged attack upon Katf was intended to culminate in the crimes perpetrated upon the victims of this case. The trial court found and the State argues that this evidence showed the means by which the defendant committed the crimes: master keys that gave him access to all three apartments and the purchase of a pellet gun prior to the attack upon Katf and prior to the crimes in this case. Both parties cite *State v. Marquez*, 222 Kan. 441, 565 P.2d 245 (1977). In discussing the preparation exception, the *Marquez* court stated:

"Preparation for an offense consists in devising or arranging means or measures necessary for its commission. [Citations omitted.] Accordingly, a series of acts that very logically convinces the reasonable mind that the actor intended that prior activities culminate in the happening of the crime in issue may have strong probative value in showing preparation. [Citation omitted.]" 222 Kan. at 446.

The attack upon Katf itself cannot be said to be preparation for the crimes perpetrated upon Butler, Rusch, and Brown. Grissom, however, is reading the *Marquez* decision too narrowly. Preparation also consists of arranging the means necessary to commit the crime. The defendant's prior conduct in relationship to Katf, specifically the master key and the pellet gun, is relevant to how he prepared to commit the crimes upon Butler, Rusch, and Brown.

With regard to opportunity, Grissom contends the evidence of the Katf attack was not relevant because the attack upon Katf and the crimes in the instant case were not closely connected in time or place and because the attack upon Katf had no probative value in placing him at Butler's or Rusch and Brown's apartment on the subsequent occasions. The State maintains the trial court was correct in finding that Grissom's possession of the pellet gun

and master keys was relevant to show his opportunity to commit the crimes. The trial court did not err in concluding the evidence was admissible to show opportunity.

Having so concluded, we need not consider the res gestae argument.

## XIII. AMENDMENT OF COMPLAINT

In the original complaint, Grissom was charged with the first-degree murder of Theresa Brown, either by premeditation or felony murder. Alternate grounds were given for the underlying felony, either aggravated burglary or aggravated kidnapping. After the preliminary hearing, the trial court found there was no probable cause to bind Grissom over on the charge of felony murder committed during the perpetration of an aggravated kidnapping. During trial, at the conclusion of the State's presentation of evidence, the State moved to amend the complaint to its original form, once again charging Grissom in the alternative with the felony murder of Brown in connection with the perpetration of aggravated kidnapping. The State based its requested amendment upon the testimony of Jacqueline Faught, the manager of Mini Storage in Raytown. Over Grissom's objection, the trial court granted the State's motion. The jury was instructed accordingly.

Grissom claims the amendment was improper because it presented a "new theory" upon which the jury could rely to find him guilty of first-degree murder. He points out that because he was not charged in a separate count with the aggravated kidnapping of Brown, he did not attempt during trial to negate a finding that he took or confined Brown. Thus, according to Grissom, he suffered irreparable prejudice, requiring reversal of the conviction for the first-degree murder of Brown.

The State argues there was no error because the State was not required to amend the complaint to have the jury instructed on the alternative theory of felony murder. We agree with the State's argument. In *State v. Barncord*, 240 Kan. 35, 726 P.2d 1322 (1986), the defendant contended the trial court erred in allowing the State, during trial, to amend the complaint and add felony murder to the first-degree murder charge. The defendant claimed prejudice because he had prepared to defend the charge of pre-

meditated murder, not felony murder. This court rejected that argument, stating:

"Actually, the amendment to include felony murder was not necessary. In *State v. Foy*, 227 Kan. 405, 607 P.2d 481 (1980), the State amended the information to allege felony murder less than a week before trial. This court ruled an amendment to the information was not actually necessary, for an information in the ordinary form charging that a killing was done with malice aforethought, deliberation, and premeditation is sufficient to sustain a conviction of murder in the first degree committed in the perpetration of a felony. [Citations omitted.]" 240 Kan. at 37.

The trial court did not err in allowing the amendment.

## XIV. CHANGE OF VENUE

Grissom argues that the trial court erred in denying his motion for a change of venue. He claims the sensational and pervasive nature of the pretrial publicity, as well as the difficulty in obtaining jurors who did not have preconceived notions about his guilt, prevented him from receiving a fair trial in Johnson County. As a result of not receiving a fair trial, he maintains, his due process rights were violated.

Change of venue is governed by K.S.A. 22-2616. Subsection (1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

In the context of change of venue, this court has discussed extensive pretrial media coverage and stated:

"Media publicity alone has never established prejudice per se. [Citations omitted.] It is the defendant's burden to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. [Citation omitted.] There is no question but that the crimes committed shocked the surrounding communities and that the local media reflected this outrage. These facts alone, however, do not entitle defendant to a change of venue. [Citation omitted.] The news reports were factual and not inflammatory and [the defendant] presented no evidence to show the media attempted to influence the outcome of the trial. [Citation omitted.]" *State v. Hunter*, 241 Kan. 629, 635, 740 P.2d 559 (1987).

Grissom acknowledges that pretrial publicity by itself does not establish sufficient prejudice to require a change of venue. Ev-

idently to show the pervasiveness of the publicity, he cites to the fact that prior to the hearing on his motion, over 120 articles were published in the local media and one Kansas City television station alone broadcast approximately 200 stories. The defendant does not claim the stories were inflammatory and nonfactual. In fact, there was evidence to the contrary. The news director at KCTV 5 testified at the change of venue hearing that in his opinion the coverage was balanced and that most of the stories were based on information contained in available court proceedings and court records. Grissom also does not claim that the media attempted to influence the trial's outcome.

At the hearing, the State introduced evidence of comparable media saturation in Sedgwick County, which the defendant contends was to show that extensive publicity was not unique to Johnson County. According to Grissom, extensive media coverage in Sedgwick County of the crimes in this case was not surprising considering that he also was a suspect in the stabbing of a Wichita woman. The news director of a Wichita television station testified that its newscast was broadcast simultaneously in Great Bend, Garden City, and Oberlin. The other Wichita stations have satellite stations in Dodge City, Hays, Colby, and Goodland. At least two-thirds of the residents of this state have access to Wichita television stations. When that is considered in conjunction with the Kansas City television markets, it is clear that most of the state, if not all, had access to the extensive publicity surrounding this case. In *State v. Salem*, 230 Kan. 341, 634 P.2d 1109 (1981), the publicity was disseminated throughout a major part of the state. This court stated that "[t]here is no reason to believe that a jury from another county in this or any adjacent judicial district would have rendered different verdicts." 230 Kan. at 345. The same can be said for this case.

Grissom also contends that his prejudice is evidenced by the fact voir dire took four days, in part because the vast number of prospective jurors had some knowledge of the case. "[T]he difficulty in selecting a fair and impartial jury is an important factor in weighing a claim of prejudice." *Hunter*, 241 Kan. at 636. The State points out that the first two days of voir dire were spent questioning potential jurors about medical, personal, and employment-related problems because the trial was estimated to last

up to five weeks and because there was a possibility the jury would be sequestered.

The granting of a change of venue lies within the sound discretion of the trial court and, absent a showing of prejudice to the substantial rights of the defendant, this court will not disturb the trial court's ruling on appeal. *State v. Ji*, 251 Kan. 3, 35-36, 832 P.2d 1176 (1992). Grissom offers speculation, not proof, that his substantial rights were prejudiced. We find no error on this issue.

## XV. MOTION FOR MISTRIAL OR FOR RECUSAL

Grissom argues that the trial judge, Judge William G. Gray, should have recused himself or declared a mistrial based upon the following statement made by the judge during the voir dire of a potential juror:

"THE COURT: Well, I think the record should reflect that the questions that the Court asked this last witness were not in an attempt to rehabilitate the juror. I did not feel that the question as to her opinion had been explored fully and I would appreciate [it] if counsel would explore that fully. The question that was in my mind was whether she had formed some definite, final opinion, or whether she understood that the evidence or the matter that she had read pointed toward guilt. *And I don't think there is any question that anyone who has read about this case or has heard anything on television or has heard the evidence that the State has proffered, and quite naturally that evidence points toward guilt. I don't think there is any question about that.*" (Emphasis added.)

The next day, the Olathe Daily News quoted the judge as saying, "The evidence at this point clearly points towards guilt. No one can deny that." Defense counsel orally moved for a mistrial or for the judge to recuse himself. Judge Gray denied the motion, noting the inaccuracy of the paper's quote, that the potential juror had been excused for cause, that no other juror had been present when the statement was made, that the State's evidence naturally would be adverse to Grissom, and that he (Judge Gray) had yet to make a determination concerning the defendant's guilt. Because of the article, the judge decided to sequester the jury.

The following day, the first day of trial, Judge Gray asked the jurors if anyone had observed media accounts of the case and received a negative response. Defense counsel then renewed his

request for a mistrial because the local media had widely disseminated the inaccurate quote. Despite the fact the jurors indicated they had not observed media accounts of the case, which would include the aforementioned inaccurate quote, counsel contended that "the publicity is so sensationalized as a result of the events from yesterday, that it is extremely difficult for this young man to get a fair trial in Johnson County." Again, the trial judge denied the motion.

The defendant claims any reasonable person who heard the judge's comment, that the State's evidence points toward guilt, would question the judge's impartiality. According to Grissom, a judge commenting upon the State's evidence creates an appearance of impropriety that requires reversal. Grissom cites *State v. Strayer*, 242 Kan. 618, 750 P.2d 390 (1988), and *State v. Griffen*, 241 Kan. 68, 734 P.2d 1089 (1987).

The judicial disqualification standard, as set forth in *Strayer* is

"whether the charge of lack of impartiality is grounded on facts that would create reasonable doubt concerning the impartiality, not in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances." *Strayer*, 242 Kan. 618, Syl. ¶ 3.

See *Griffen*, 241 Kan. 68, Syl. ¶ 5. The *Griffen* court also held:

"Where the defendant in a criminal action contends the trial judge was biased and partial, the determination as to whether the defendant received a fair trial involves a two-part analysis: (1) Did the trial judge have a duty to recuse under the Code of Judicial Conduct? (2) If he did have a duty to recuse and failed to do so, was there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?" 241 Kan. 68, Syl. ¶ 4.

In *State v. Nguyen*, 251 Kan. 69, Syl. ¶¶ 4, 5, 833 P.2d 937 (1992), we stated:

"Allegations of judicial misconduct . . . must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party."

"A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial."

Grissom does not allege that Judge Gray was biased and partial, only that there was an appearance of partiality because of the inaccurate quote attributed to the judge. Grissom does not contend that Judge Gray had a duty to recuse himself under the Code of Judicial Conduct. Furthermore, the defendant fails to show actual bias or prejudice. The potential juror was excused for cause. No other potential juror was present when the judge made his comment. At the hearing on the defendant's motions for a new trial, for arrest of judgment, and to set aside the verdict, Judge Gray commented that after questioning the jury very carefully, he felt certain none of the jurors had read the article containing the inaccurate quote. Nonetheless, the judge had ordered the sequestering of the jury to avoid any future media problems.

In the alternative, Grissom argues that Judge Gray erred in failing to declare a mistrial, based upon the reasons already mentioned. K.S.A. 22-3423(1)(c) authorizes a mistrial if "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

"The decision to declare a mistrial . . . lies with the sound discretion of the trial court. The defendant has a burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court. [Citation omitted.]" *State v. Stallings*, 246 Kan. 642, 646, 792 P.2d 1013 (1990).

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Soden*, 251 Kan. 225, Syl. ¶ 9, 834 P.2d 358 (1992).

For the reasons already discussed, Grissom fails to show that he suffered substantial prejudice because of the judge's remark or because of the inaccurate reporting of the remark. This court cannot say no reasonable person would agree with Judge Gray's refusal to declare a mistrial.

## XVI. EFFECTIVE ASSISTANCE OF COUNSEL

Grissom initially was represented by the Johnson County Public Defender's Office. Seven and one-half months after being appointed, the public defender withdrew because of a conflict of interest. Grissom argues that he was denied effective assistance

of counsel, in part, because his public defender failed to file motions challenging the admissibility of his statement, of DNA evidence, and of evidence seized. According to Grissom, his new counsel had to request a continuance of the trial in order to prepare his defense, which included preparing and filing these motions. He claims this delay allowed the State to discover new and damaging evidence. Grissom maintains there is a reasonable probability the outcome of his trial would have been different had it not been for the unreasonable delays caused by the Johnson County Public Defender's Office.

"The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), set forth a two-pronged test for determining whether criminal defendants have been denied effective assistance of counsel. Kansas adopted the *Strickland* test in *Chamberlain v. State*, 236 Kan. 650, 657, 694 P.2d 468 (1985). The defendant must show counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different. 236 Kan. at 656-57.

"In meeting this burden, the defendant must overcome a presumption that counsel's assistance was reasonable. 236 Kan. at 654. Further, '[m]uch deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened.' 236 Kan. at 659-60." *Taylor v. State*, 251 Kan. 272, 281, 834 P.2d 1325 (1992).

The trial court denied Grissom's motion for a new trial on the basis of ineffective assistance of counsel. The court stated:

"[I]t's not the Court's function to determine trial tactics and to tell counsel what they should do. I can certainly indicate that the Court wondered during those months [the public defender was representing Grissom] where those motions were and why they were not being presented. But again, they were presented [by Grissom's subsequent counsel], they were effectively presented and considered and it is impossible for this Court to find that ineffective assistance of counsel in this case resulted to the ultimate detriment of the defendant to the extent that he was not afforded a fair trial. And to the contrary, the Court will find that he did have effective assistance of counsel in the entirety of the proceedings."

Grissom did not suffer ineffective assistance of counsel because his public defender failed to file certain motions. As the trial court noted, Grissom's subsequent counsel filed those motions

and defended Grissom vigorously. The delay in filing those motions did not deny Grissom a fair trial.

Grissom also claims that but for the delay in going to trial, the State would not have discovered new and damaging evidence, in particular the testimony of Jacqueline Faught, former manager of Mini Warehouse in Raytown. Faught's testimony linked Grissom with Brown on the day of her disappearance and helped provide the connection for matching the blue paint smears on Rusch's car. The police talked with Faught and looked at the Mini Warehouse's storage records prior to the continuance being granted. Grissom's argument is not persuasive. Delays can cause additional evidence to be discovered or can cause the loss of evidence. That is a risk that falls on both sides equally and, under the facts before us, has no bearing on a claim of ineffective assistance of counsel.

## XVII. SENTENCE

Prior to sentencing, the State filed a motion to have Grissom's sentence enhanced as a third-time offender. The defendant argues that the trial court's enhancement of his sentence was improper because it violates the mandate of *State v. Wilson*, 6 Kan. App. 2d 302, 306, 627 P.2d 1185, *aff'd* 230 Kan. 287, 634 P.2d 1078 (1981).

At the outset, we note that Grissom's sentences were not enhanced pursuant to the habitual criminal statute, K.S.A. 21-4504 for the three first-degree murder convictions or the aggravated kidnapping conviction. The defendant was given the only sentence available—life—on each of these counts. The trial court was within its authority and discretion to order the life sentences to run consecutively. In addition, the misdemeanor theft sentence was not enhanced. Thus, we affirm the four life sentences and one-year misdemeanor theft sentence and the order that they be served consecutively.

Grissom also was convicted of two counts of aggravated burglary and four counts of robbery, and these six sentences were enhanced. It is these six sentences that are in issue.

K.S.A. 21-4504 sets forth the manner in which a trial court can enhance the sentence of a defendant who has prior felony convictions.

In *Wilson*, the Court of Appeals held:

"[F]or the enhancement of the sentence of a defendant as a third offender under K.S.A. 1980 Supp. 21-4504(2), it is necessary that each succeeding offense be committed after conviction for the preceding offense. Otherwise stated, it is required that there be the commission and conviction of one offense, followed by the commission and conviction of a second offense, followed by the commission of the principal offense upon conviction of which sentence enhancement is sought." 6 Kan. App. 2d at 306.

The legislature since has reworded the statute, but in form, not substance. *Wilson* is applicable to the statute at issue in this case.

At Grissom's sentencing, the State introduced evidence that the defendant had pled guilty in 1985 to felony theft in two Johnson County cases. In No. K-48353, Grissom was charged with committing felony theft and burglary on June 28, 1984. He pled guilty to the charge on March 29, 1985. In No. K-47424, Grissom was charged with committing felony theft on October 2, 1984. He pled guilty to that charge and subsequently was sentenced. Hence, the October 2, 1984, commission of the second offense occurred prior to the March 29, 1985, conviction for the first offense.

The enhancement of Grissom's sentence is improper under *Wilson* because the commission of the second offense occurred before the conviction for the first offense.

The State claims *Wilson* is not consistent with the plain language and the purpose of K.S.A. 21-4504 and asks this court to modify *Wilson* accordingly. The State argues that the language of the statute is unambiguous: Enhancement depends upon the number of prior *convictions* a defendant has, not the sequential order in which the defendant committed and was convicted of the prior felonies.

We note that our own Tenth Circuit is in accord with *Wilson*. In the recent case of *U.S. v. Abreu*, 962 F.2d 1447, 1453-54 (10th Cir. 1992) (en banc), the Court of Appeals for the Tenth Circuit stated "an enhanced sentence is only proper when the underlying offense has been committed after a judgment of conviction on the prior . . . offense."

We also note the *Wilson* case is approaching 12 years of age and the legislature has had many chances to change it if we misinterpreted its intent. It has not changed the statute.

The State next requests that this court differentiate "between sentence enhancement for an offense which was committed prior to the underlying conviction and enhancement for an offense committed after two prior convictions, the second of which was for a crime committed prior to the first conviction." The State cites *Castle v. Gladden*, 201 Or. 353, 270 P.2d 675 (1954), in which the Oregon Supreme Court upheld the defendant's sentence as a fourth-time offender even though the defendant committed the third offense before he was convicted of the second offense. For the reasons expressed above, if a change is to be made at this point, it should be made by the legislature.

At the sentencing hearing, the State also proffered evidence of Grissom's conviction in Shawnee County in 1979 for juvenile aggravated escape from custody and his conviction in Riley County in 1983 for felony theft. For each conviction, the State submitted a certified copy of the journal entry of conviction, fingerprints, and a mug shot. Grissom objected, arguing the evidence was not competent, was hearsay, and had not been attested to properly. The State replied that the custodians of the documents, someone with the Shawnee County Sheriff's Department and a lieutenant with the Riley County Police Department, had attested to their respective documents (fingerprints and mug shot) and that the Clerks of the Courts for Shawnee County and Riley County had attested to the journal entries.

The trial court refused to admit the evidence, stating:

"Court notes that the content of the Affidavit accompanying each is not sufficient to identify the fingerprints and the photographs as relating to any specific case and while the documents in the Complaint and the journal entry are properly attested, at this time unless the identification issue is addressed in some other manner, the Court would find that the Affidavits would not be sufficient for that purpose."

The State did not present any more evidence concerning the Shawnee County and Riley County convictions because K.S.A. 21-4504 only requires proof of two prior felonies, and the State believed sufficient evidence had been presented to the court in the form of the Johnson County convictions. In other words, the State was not aware of, or had forgotten, the *Wilson* case, and the numerous cases that discuss *Wilson*.

On appeal, the State contends the trial court "could have" admitted evidence of these convictions, relying upon *State v. Baker*, 237 Kan. 54, 697 P.2d 1267 (1985), and *State v. Cippola*, 202 Kan. 624, 451 P.2d 199, *cert. denied* 396 U.S. 967 (1969). Unlike in *Baker* and *Cippola*, the convictions were not conceded by the defendant who, in fact, questioned the identity evidence. Furthermore, the questioned documents are not part of the record on appeal.

We note that in *Wilson*, language was included limiting the authority of the trial court to consideration of the identical facts existing at the time of the original sentence. The legislature since has made it clear the trial court can consider evidence of any other felony conviction that could have been considered at the time the original sentence was imposed, regardless of whether it was introduced at that time. K.S.A. 21-4504(c).

In summary, at resentencing, the trial court has one valid conviction already introduced and can consider either the Shawnee County or Riley County felony convictions if properly admitted into evidence. We have no way of knowing whether a valid second felony conviction exists from the record before us and, thus, have no choice but to vacate the six sentences and remand for resentencing.

We conclude the convictions for all offenses are affirmed. The four life sentences for first-degree murder and aggravated kidnapping, as well as the one-year sentence for misdemeanor theft—all to run consecutively—are affirmed. The remaining six sentences, two for aggravated burglary and four for robbery, are vacated and remanded for resentencing.